824 So.2d 908 (2002)
John Carl MESE, Appellant,
v.
The STATE of Florida, Appellee.
Nos. 3D98-2410, 99-921.
District Court of Appeal of Florida, Third District.
June 19, 2002.
Rehearing and Certification of Question Denied September 4, 2002.
*910 Dunlap and Silvers, P.A. and Marcia J. Silvers; Arthur Joel Berger, Miami, for appellant.
Robert A. Butterworth, Attorney General and Michael J. Neimand, Assistant Attorney General, for appellee.
Before GREEN, SHEVIN, and RAMIREZ, JJ.

I
GREEN, J.
John Carl Mese, along with co-defendants, Daniel Lugo and Noel Doorbal were charged in a forty-six count indictment. Mese was charged with the following crimes: conspiracy to commit RICO, RICO; two counts of first degree murder one for Frank Griga and one for Krisztina Furton; two counts of kidnaping one for Griga and one for Furton; one count of attempted extortion of either Griga or Furton; attempted first degree murder of Marcelo Schiller; kidnaping of Schiller; armed robbery of Schiller; extortion of Schiller; nine counts of money laundering of nine checks involving the Schiller incident; one count each of forging, falsely notarizing and uttering a Schiller quit claim deed; one count each of forging, falsely notarizing and uttering a Schiller change of beneficiary form; twelve counts of forging, falsely notarizing and uttering four identical sets of a Schiller assignment of contract; and conspiracy to commit a felonylater defined as a conspiracy to kidnap Winston Lee.
Prior to trial, Mese filed motions to sever his case from that of both co-defendants on the grounds that the Schiller and Griga/Furton crimes were separate and that there was no evidence that he had participated in the Griga/Furton crimes with his co-defendants. In response, the state asserted that there was evidence that Mese was part of an ongoing criminal conspiracy whose objective was to kidnap and torture wealthy victims until they turned over their assets and then to kill them. Mese, an accountant, allegedly had the specific role of laundering the victim's assets once the co-conspirators acquired them, The trial court denied Mese's motions for severance.
The state announced that it would seek the death penalty against Lugo and Doorbal, but not against Mese. The trial court conducted one trial using two juries after the state informed the court that it would seek to introduce a statement from Lugo which implicated Doorbal and some statements from Doorbal and Mese which implicated Lugo. One jury would hear the case against Mese and Doorbal. The other jury would hear the case against Lugo. The two juries would sit together during the entire guilt phase of the trial, separating only to hear testimony from witnesses to whom the post-arrest incriminating statements were made.
Both at the close of the state's case in chief and at the close of all the evidence, Mese moved for a judgment of acquittal on the counts of Rico conspiracy, Rico, and those counts involving Griga/Furton and the Lee conspiracy. The state responded that the evidence against Mese on the Rico conspiracy count was sufficient for the jury's consideration as it established that Mese participated in the Schiller crimes, and there was testimony that Mese's role in the criminal organization was to launder monies secured from all crimes by the codefendants. The trial court reserved ruling and submitted the case to the jury.
*911 The jury returned its verdict finding Mese guilty as charged on all counts. Following the return of the verdict, Mese filed his motion to set aside the jury verdict as to all of the RICO counts, the Griga/Furton counts and the Lee count. The trial court granted the motion and acquitted Mese of all crimes involving Rico, Griga/Furton, and Lee. As a result, Mese stood convicted for only those crimes emanating from the Schiller incident. He was sentenced to fifty-six years.[1]
Mese has timely perfected the instant appeal and argues that he is entitled to a new trial based upon three errors. First, he maintains that the trial court erred in denying his three motions for severance of his trial from that of his two co-defendants pursuant to Florida Rules of Criminal Procedure 3.152(b)(3). Next, Mese asserts that the trial court erred when it permitted the state's forensic accountant to testify that Mese was guilty of money laundering. Finally, he argues that he is entitled to a new trial because the prosecutor used the trial judge to vouch for the credibility of the state's main witness during closing argument. The state has filed a cross-appeal and argues that the trial court erred in granting Mese's motion to set aside the jury verdict finding Mese guilty of RICO conspiracy.[2]

II
On the main appeal, Mese first contends that the trial court erred in denying his repeated motions for severance of his trial from that of his co-defendants pursuant to Florida Rules of Criminal Procedure 3.152(b)(3)[3] on the grounds, among other things, that there was a gross disparity in the quantum of evidence to be introduced against him and that to be introduced against his co-defendants, Lugo and Doorbal. Moreover, he argued that there was a prejudicial evidentiary spillover in a joint trial where the state was seeking the death penalty against his co-defendants and where there was no evidence that he had been involved with the planning or killing of Griga and Furton, or in the destruction and disposal of their bodies. Mese points out that he stands convicted only of the substantive crimes involving victim Schiller and that the counts on which he was acquitted by the trial court included the RICO conspiracy count upon which joinder had been predicated.
By way of a cross-appeal, the state responds to Mese's first argument by asserting that joinder of the defendants was proper and that the trial court erred in granting Mese's motion to set aside his guilty RICO conspiracy verdict. The state maintains that the evidence adduced at trial was sufficient to establish that Mese's presence in the criminal organization was to launder the assets of all of its victims. Since Mese's first argument on the main appeal depends upon the propriety of his *912 acquittal on the RICO conspiracy count by the trial court, we elect to address the state's cross-appeal first.

III
The trial court ordered Mese's acquittal on the RICO conspiracy charges on the ground that the evidence had failed to establish Mese's knowledge of and agreement to commit two predicate acts. The trial court believed that the evidence only established Mese's knowledge and culpability in the criminal incidents involving victim Schiller and not those involving victims Griga and Furton or Lee. The state responds that this was error since RICO conspiracy is proven if the evidence established that a defendant knew of the overall objectives of the criminal enterprise and agreed to further its purpose. Here, the state maintains that the evidence and the reasonable inferences therefrom showed that Mese, along with co-defendants Lugo and Doorbal, and Jorge Delgado were members of an association or organization whose common purpose was to launder money and other assets obtained from innocent wealthy victims by illegal and malicious means. The state further asserts that since the evidence established that Mese's role in the organization was his agreement to launder the assets of the victims, it was sufficient to support the RICO conspiracy guilty verdict, even though Mese may not have known of every detail of the Griga/Furton crimes nor committed an overt act in furtherance of the Griga/Furton crimes. After viewing the evidence and the reasonable inferences therefrom in the light most favorable to the state, see Gross v. State, 765 So.2d 39, 46 (Fla.2000), we agree that the state presented sufficient evidence at trial to support Mese's conviction for RICO conspiracy.
Florida's RICO statute, section 895.03(3), Florida Statutes (1993), makes it "unlawful for any person employed by, or associated with any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt." A pattern of racketeering activity is defined by statute as:
[E]ngaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurred after the effective date of this act and that the last of such incidents occurred within 5 years after a prior incident of racketeering conduct.
See § 895.02(4), Fla. Stat. (1993).
Given the fact that the Florida RICO statute is patterned after the federal RICO statute,[4] Florida courts look to federal courts for guidance in construing RICO provisions. See Gross, 765 So.2d at 42.
*913 In Salinas v. United States, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), the United States Supreme Court specifically found that a RICO conspirator need not commit or agree to commit two predicate acts himself:
It makes no difference that the substantive offense under § 1962(c) requires two or more predicate acts. The interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense.
See Id. at 65, 118 S.Ct. 469.
The court noted that the federal RICO conspiracy statute, § 1962(d), broadened conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring the Government to prove that each conspirator agreed that he would be the one to commit two predicate acts. Id. at 64, 118 S.Ct. 469. The RICO conspirator, according to the court, must:
intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense. It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.
Id.
Our view of the evidence in the instant case, in a light most favorable to the state, leads us to conclude that it was sufficient to establish Mese's agreement to the overall objective of the conspiracy which was to kidnap wealthy victims, force them to sign over their assets and have those assets laundered through Mese. Beginning with the first incident involving victim Schiller, the state established that the conspirators, other than Mese, kidnaped and held Schiller for approximately one month. During this time, Schiller was tortured and forced to, among other things, sign over checks, a deed to real property and a change of insurance beneficiary form against his will. Mese's role was then to fraudulently change the property deeds and notarize all of the documents to make them appear legal and launder all the money from this criminal undertaking.
To establish Mese's complicity in the continuing RICO conspiracy, the state relied primarily upon the testimony of Delgado, one of the conspirators who testified on the state's behalf. According to Delgado, the second target of the conspiracy was to be a Jamaican businessman named Winston Lee. That plan was thwarted, however, due to Lee's travel schedule. Delgado testified that he then learned from Doorbal that a wealthy Hungarian couple, Frank Griga/Krisztina Furton would be the next targets of the conspiracy. According to Delgado, the plan for these victims would be the same as for Schiller. That is, they would be kidnaped and forced to sign over all of their assets to the conspirators. The documents would thereafter be notarized by Mese, who would then launder their money in and out of the country.[5] Griga *914 and Furton, however, were abducted and murdered prior to their signing over their assets. Despite their murders, Delgado testified that the plan remained to acquire the couple's assets.[6] According to Delgado, the plan was to file a fraudulent lawsuit against Griga in the Bahamas and any monies derived from that lawsuit would then be channeled through a corporation owned by Lugo and Mese.[7]
Given this evidence of Mese's support by laundering money, the fact that Mese was not personally involved in the kidnaping, abduction and/or murder of the Hungarian couple does not thereby exculpate him from the conspiracy. See Salinas, 522 U.S. at 64, 118 S.Ct. 469 ("If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators"). Nor is Mese exculpated by the fact that he never had the opportunity to launder any of the assets belonging to Griga/Furtonthe crime *915 of conspiracy is punishable whether or not the substantive crime ensues. Id. The evidence shows that Mese agreed to make himself available to launder the ill-gotten gains from the underlying predicate acts of the co-conspirators.
Apart from Delgado's testimony about Mese's role in the Griga/Furton incident, the state also adduced testimony from a wrestling promoter named Howard Brody who met with Mese at or around the time of the Griga/Furton crimes. Brody was seeking an investor and, according to Brody, Mese stated that he and a man named Danny were interested in investing some money, but "they were waiting on a deal to close or something that was in the process of being done." Brody further testified that later something happened and Mese's partner, Danny, was no longer around to invest so the deal never came to fruition.
Brody's testimony was presented as circumstantial evidence of Mese's knowledge of the plan to extort money from Griga/Furton in furtherance of the RICO conspiracy. The state may rely upon circumstantial evidence to establish "that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." See United States v. Castro, 89 F.3d 1443, 1451 (11th Cir.1996) (citations omitted).
Thus, in viewing the foregoing evidence in a light most favorable to the state, we conclude that a jury could have reasonably found that one common agreement on a single overall objective existed between Mese and the co-defendants. See Id. at 1451. In proving that Mese was a part of this RICO conspiracy, it was not necessary for the state to establish that he agreed with every other conspirator, knew of his fellow conspirators, was aware of all of the details of the conspiracy, or even contemplated participating in the same related crime. Id. Accordingly, the trial court erred in granting Mese's motion to set aside his guilty verdict on the RICO conspiracy counts.

IV
In light of our conclusion that the evidence was sufficient to support Mese's conviction for RICO conspiracy, we find no merit to Mese's initial argument on the main appeal that the trial court erred in denying his repeated motions for a severance of his trial from that of his two co-defendants Lugo and Doorbal. From the face of the indictment, it is clear that Mese was joined with the two co-defendants pursuant to Florida Rule of Criminal Procedure Rule 3.150(b)(2). That rule provides that:
Two or more defendants may be charged in the same indictment or information on which they are to be tried when:
(2) each defendant is charged with conspiracy and some of the defendants are also charged with 1 or more offenses alleged to have been committed in furtherance of the conspiracy.
Count one of the indictment charged each defendant with conspiracy to commit RICO. Mese contends that he was entitled to a severance pursuant to Florida Rule of Criminal Procedure 3.152(b)(3).[8] That rule, however, would only have permitted a severance in this case if the evidence was insufficient to establish Mese's guilt for RICO conspiracy. Since we have found the evidence to be sufficient to support Mese's guilty verdict for RICO conspiracy, the trial court's denial of his severance motions cannot be deemed to be an abuse *916 of discretion. See Fotopoulos v. State, 608 So.2d 784, 790 (Fla.1992)' Crossley v. State, 596 So.2d 447 (Fla.1992); Wright v. State, 739 So.2d 1230, 1232 (Fla. 1st DCA 1999).

V
Mese next asserts that the trial court erred in permitting the state's expert forensic accountant to offer his opinion during both direct and cross-examination about whether Mese's various transfers of Schiller's funds from one account to another was done in an effort to conceal the source of those funds. Mese maintains that such opinion testimony on the ultimate issue of whether he was guilty of money laundering was inadmissible. See Martinez v. State, 761 So.2d 1074 (Fla. 2000). In reviewing the record, however, we note during those various occasions on direct examination where the expert offered his opinion in this regard, there was either no objection or an inadequate objection interposed by defense counsel. Therefore, this issue was not properly preserved for our appellate review. See Moore v. State, 418 So.2d 435 (Fla. 3d DCA 1982); United States v. Fox, 613 F.2d 99 (5th Cir.1980) (if proper objection not interposed at the time the evidence is presented, the appellant will be deemed to have waived objection). Further, when the expert offered his opinion during cross-examination, it was in response to questioning posed by Mese's counsel. Consequently, any error occurring at this time was invited. Sheffield v. Superior Ins. Co., 800 So.2d 197 (Fla.2001) (under the invited-error doctrine, "a party may not make or invite error at trial and then take advantage of the error on appeal").

VI
As his final point on appeal, Mese asserts that he is entitled to a new trial on the RICO conspiracy charge based upon a prosecutorial comment made during closing argument that improperly led the jury to believe that the trial judge was vouching for Delgado's credibility. Specifically, the argument of which Mese now complains occurred during the following underscored argument by the state:
And you know that deal, I know defense is gonna say he made that deal before he gave that sworn statement. No, he didn't. He did not. The deal is when the judge accepts the deal. The judge accepted the deal on March 22nd. He gave his statement on March 20th. Between that he was debriefed. That's what its called cops talk to him day and night, went over evidence, made sure that they knew what he was talking about, that he wasn't lying to them and then the deal was struck. Whatever piece of paper he had with me, that's nothing because it's the judge that imposes the sentence. And don't let anybody tell you its something else. I suggested the deal to the judge. The judge had to be assured that what we were doing was what George wanted to do and that he gave sworn testimony that was truthful. And that's what happened on March 22nd. Nothing had happened before that holds George to fifteen years. Absolutely nothing. It wasn't until March 22nd after he gave his statement, that he knew he was gonna get fifteen if he told the truth.
And why in a sworn statement? So George Delgado in the three years that he waited or the two years that he waited, didn't decide to sit on this stand and help his friends. So that I had something to go back to the court with and say, uh-uh, judge, he lied, and he gets forty now. That's not gonna happen. George Delgado gets his fifteen years.
In reading the challenged comments by the prosecutor in context with the remainder of the arguments outlined above, we *917 do not agree with Mese that the state was attempting to convince the jury that the trial court was vouching for Delgado's credibility. Rather, it is clear to us that the prosecutor was attempting to outline the complete nature of Delgado's plea arrangement with the state, which was entirely proper. See Rogowski v. State, 643 So.2d 1144 (Fla. 3d DCA 1994).

VII
In conclusion, for the foregoing reasons, we reverse the order setting aside the appellant's guilty verdicts for RICO conspiracy and remand for his sentencing on those counts. We affirm his conviction and sentences on the remaining counts.
Reverse and remanded in part with directions. Affirmed in part.
SHEVIN, J., concurs.
RAMIREZ, J., (dissenting).
I respectfully dissent because the evidence was insufficient to show that Mese knew of any plans to kidnap Lee, Furton, and Griga or that he agreed to any acts beyond laundering Schiller's assets. I would therefore affirm the trial court's order setting aside the verdict as to the conspiracy count, and grant Mese a new trial.

1. The Conspiracy as to Griga and Furton
I agree with the majority that Mese can be guilty of conspiracy "by agreeing to facilitate only some of the acts leading to the substantive offense." Salinas v. United States, 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). "The government may either prove (1) that a defendant agreed to the overall objective of the conspiracy or (2) that the defendant personally committed two predicate acts, thereby participating in a single objective conspiracy." United States v. Shenberg, 89 F.3d 1461, 1471 (11th Cir.1996). The trial court granted Mese's motion for acquittal on the RICO charges based solely on the fact that the proof did not establish the second prong, to wit: that the defendant had not personally committed two predicate acts. I agree with the majority that this was error because Mese could have been convicted of conspiracy under the first prong. But in my view, the State never proved the first prong either, that Mese agreed to the overall objective of the conspiracy. The State must prove that Mese manifested this agreement. See United States v. Neapolitan, 791 F.2d 489, 498 (7th Cir.1986)(stating that "the defendant must manifest his agreement to the objective of a violation of RICO."). "In reviewing conspiracy convictions, the question is whether there is substantial evidence to support the verdicts." United States v. Russo, 796 F.2d 1443, 1455 (11th Cir.1986). The State in this case failed to prove that Mese agreed to facilitate an overall scheme. In fact, there is no evidence that he even knew what the alleged co-conspirators were doing.
The State contends that the overall objective of the conspiracy was to kidnap wealthy victims in order to coerce them into signing away their assets and that Mese agreed to launder any assets so obtained. Mese may have agreed to commit notary fraud or launder money, but there is no iota of proof that he knew of or assisted in the kidnaping of anyone.[9] Even as it relates to Schiller, the fact that Mese notarized Schiller's documents does *918 not prove that he knew Schiller had been kidnaped and had signed them under duress. The documents simply could have been forged. As to Griga and Furton, there is a total lack of evidence that Mese knew anything about the plan to kidnap them.
For its proof that Mese was part of the Griga/Furton crimes, the State relies on Delgado's testimony, which is quoted in footnotes 5, 6 and 7 of the majority opinion. This is submitted as proof Mese knew of the plan to kidnap the victims and force them to sign over all their assets. A careful reading of the transcript, however, merely shows that Delgado was told by Lugo that he, Lugo, expected Mese to help launder the money. Lugo never told Delgado that Mese had agreed to do so. Additionally, the fact that Lugo planned to deposit money from a phony lawsuit into a corporation he and Mese owned does not prove Mese knew that the money originated from a kidnaping. The State also presented the testimony of Howard Brody, a wrestling promoter, as circumstantial evidence that Mese knew Lugo was planning further crimes. Brody testified that in the month prior to the Griga/Furton murders, Mese told him that a potential investor named Danny, (referring to co-defendant Daniel Lugo), was waiting for a deal to close before money would be available. This is hardly proof that Mese knew of and agreed to further schemes, especially where it is not known precisely when Lugo and Doorbal decided to kidnap Griga and Furton. Lugo could have simply told Mese that he was coming into some money from any type of deal and that is what Mese was referring to when he approached Brody about investing. Thus, the State's proof of conspiracy is based on inconclusive double hearsay and a vague reference to the possibility that Lugo might come into some money from an unspecified source.

2. The Conspiracy as to Schiller
Even as to Schiller, I do not believe that the evidence proves that Mese knew what was happening in the overall scheme to kidnap and coerce the victims to sign over their assets. A review of the evidence of the Schiller crimes is necessary.
Jorge Delgado, the State's star witness, had a business relationship with Marcello Schiller which terminated due to Delgado's association with Daniel Lugo. Lugo then recommended that Delgado hire Mese as his accountant. After Delgado's falling out with Schiller, Lugo convinced Delgado that Schiller had been cheating Delgado and, along with Noel Doorbal, they concocted a scheme to kidnap Schiller and extort the money Schiller purportedly owed Delgado. After several unsuccessful attempts, Schiller was kidnaped on November 15, 1994.
While Schiller was being held hostage, he was brutally tortured to obtain his cooperation. They also threatened Schiller with harm to his wife and children. He agreed to cooperate if his wife and children were to leave the country. He was instructed to contact his travel agent and his wife to arrange for her travel to Colombia. After his wife and children left, his captors had free access to his home, as they also knew his alarm code and the combination to his safe. During the next four weeks, Lugo systematically looted all of Schiller's property, eventually appropriating over $1.2 million in assets. Schiller never saw or spoke with Mese. In fact, he had never seen Mese in his life until after Mese's arrest. The evidence at trial was that Mese notarized the documents Schiller had signed, by forging signatures, and then laundered the money obtained from Schiller's assets.
When his captors were satisfied that they no longer needed Schiller, they attempted to murder him by making it appear he was killed in a car accident. After forcing Schiller to drink from a bottle of *919 liquor, Lugo drove the car into a pole and Lugo and Doorbal poured gasoline on the car, then set it on fire. As they started to drive away in another car, they noticed that Schiller had gotten out of his car, so they ran him over twice and left him for dead.
Schiller survived and, still in fear for his life, had himself transferred by air ambulance to New York. He went into hiding without contacting the police, but hired investigators to help regain his property. The investigator followed the paper trail to Mese, who denied knowing Schiller when contacted. When the investigator confronted Mese with the documents he had notarized, Mese agreed to set up a meeting with Lugo and Delgado. After taking the investigator to Delgado's office, Mese left. The investigator told Delgado that unless Schiller's money and property was returned, Schiller would report the incident to the police, but would otherwise not press charges.
After months of unsuccessful negotiations, Schiller decided in April 1995 to report the crime to the police, but after meeting with an investigative officer, Schiller concluded that the police did not believe him and again left the country. It was not until late May 1995 that Schiller was contacted by his investigator and told that there had been a crime similar to the crimes against him and that the police wanted him to return to Miami and give a statement.
The evidence thus shows that the facts of the Schiller kidnaping, extortion and attempted murder are so incredible that it was only after the police learned of the Griga/Furton murders that they began investigating the Schiller incident. Yet the State contends that Mese was supposed to have figured the whole thing out when he was given several documents to notarize.
Therefore, I believe that even as to the Schiller crimes, the evidence showed that Mese was guilty of notary fraud and money laundering, but not attempted murder and kidnaping.

3. Severance
Because joinder of the defendants was predicated on the RICO conspiracy count, Mese should have been allowed to sever his trial pursuant to Florida Rule of Criminal Procedure 3.152(b)(3). The transcript of the trial amounted to 15,273 pages. The evidence pertinent to Mese would be less than 100 pages. While evidence of these atrocious crimes was arguably properly admitted against Lugo and Doorbal who were sentenced to death, in my view, it made a dispassionate evaluation of the evidence against Mese impossible. I would thus grant Mese a new trial on that basis.
The purpose of rule 3.152 is to assure the fair determination of each defendant's guilt or innocence. See McCray v. State, 416 So.2d 804, 806 (Fla.1982). "Severance is not necessary, however, `when all the relevant evidence regarding the criminal offense is presented in such a manner that the jury can distinguish the evidence relating to each defendant's acts, conduct, and statements, and can then apply the law intelligently and without confusion to determine the individual defendant's guilt or innocence.'" Coleman v. State, 610 So.2d 1283, 1285 (Fla.1992). Severance need not be granted simply because there is evidence of guilt applicable to only one of multiple defendants. See, e.g., Johnson v. State, 720 So.2d 232, 236 (Fla.1998). "The granting or denying of a motion for severance lies within the sound discretion of the trial judge. A denial of a motion for severance constitutes an abuse of discretion only if the defendant can demonstrate that he was injured by having a joint trial." Daniels v. State, 634 So.2d 187, 192 (Fla. 3d DCA 1994) (citations omitted).
In this case, the evidence presented against Mese's co-defendants pertaining to *920 the Schiller and the Griga/Furton murders was highly prejudicial to Mese. The majority of the evidence in this lengthy trial was directed at crimes the co-defendants committed. The State opened and closed its case with the crimes against Griga and Furton, and forty-seven witnesses testified concerning those murders. The evidence showed that Doorbal and Lugo had lured Griga and Furton to Doorbal's apartment; Griga was strangled and Furton was tortured before she was murdered; the bodies of Griga and Furton were dismembered before they were stuffed into oil drums and dumped in the Everglades; and Griga and Furton's severed heads and hands were burned in an effort to disguise their identities. Additionally, graphic photos of the bodies were displayed to the jury. It is ludicrous to think that the evidence of these horrific acts, coupled with the graphic photos, did not obliterate Mese's right to a fair trial.

4. Expert Opinion
Mese is also entitled to a new trial because the State's expert witness was improperly allowed to advise the jury on how to decide the case. See Schneer v. Allstate Indem. Co., 767 So.2d 485, 488 (Fla. 3d DCA 2000). Mese was charged with six counts of money laundering. The State called Christopher McFarland as an expert to explain the financial transactions Mese was involved in. McFarland testified that certain transactions were completed in order to conceal the source of the funds, and that Mese laundered money. When McFarland was asked how he could testify that Mese had knowledge of any account activity since Mese was not a signatory, he replied:
[I]n my opinion, you know, he's a very clever CPA which basically had two partners that were not as clever as he, which was Doorbal and Lugo and he made sure his name was not there.
. . .
That's why he ended up in my opinion profiting to the extent of the 1.26 million dollar[s] because, you know this is clearly a plan that was well designed. Well thought out and you know, it takes a very witty an[d] knowledgeable individual such as you know somebody who has a lot of years in accounting, banking and financial experience and I attribute that here to being John Carl Mese, as the master mind behind this entire laundering scheme of 1.2 million dollars.
Although expert testimony is not objectionable because it includes an opinion on the ultimate issue to be decided by the trier of fact, see section 90.703, Florida Statutes (2000), McFarland went far beyond merely assisting the jury by providing evidence from which they could determine whether Mese laundered money.

5. Conclusion
I would therefore affirm the trial court's order setting aside the jury's verdict on the RICO conspiracy counts and reverse for a new trial on the remaining counts.
NOTES
[1] His co-defendants, Lugo and Doorbal, were convicted and the two juries returned verdicts recommending a death sentence for each. Their respective appeals are now pending before the Supreme Court of Florida.
[2] The state has not challenged the trial court's acquittal of Mese on the substantive RICO charges since such charges require that a defendant participate in at least two predicate acts, and the evidence at the trial below failed to establish that Mese had participated in the predicate acts.
[3] That rule provides that:

In cases in which at the close of the state's case or at the close of all the evidence, the evidence is not sufficient to support a finding that allegations on which the joinder of a defendant is based have been proved, the court shall, on motion of that defendant, grant a severance unless the court finds that severance is unnecessary to achieve a fair determination of that defendant's guilt or innocence.
[4] The federal RICO statute provides, inter alia, that:

[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity or collection of unlawful debts.
See 18 U.S.C.1962(c) (1994).
A pattern of racketeering activity is defined as requiring:
requiring at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the omission of a prior act of racketeering activity.
See 18 U.S.C.1961(5) (1994).
[5] Delgado testified as follows:

Q. Now, prior to this time, had you found out who was supposed to take care of the money that was supposed to be received from the Hungarian couple?
A. Lugo
Q. Was he gonna have any help?
A. Well, he told me he was gonna take care of it through Mese going to the Bahamas and by flying over there and doing the account from over there. He was gonna bring back the money.
* * * *
Q. And besides Lugo telling you that Mr. Mese would launder the money that came in from the Hungarians, through these offshore corporations, thatdid Mr. Mese have anything to do with the planning or the abduction or the murders of the Hungarians?
A. No.
Q. And what Lugo was saying was that he expected Mr. Mese to assist him in laundering the money? Isn't that right?
A. Yes.
Q. But, he never told you, meaning Lugo never told you that he had specifically discussed with Mese that this is what we are going to do and we expect you to help us launder this money? Isn't that correct?
A. What's correct is that he had told me that he would help in anything to do with transfer of the money.
Q. You are saying that conversation occurred between you and Lugo?
A. Between me and Lugo, yes.
* * * *
[6] Was this still the plan to try and get the money?
A. Yes.
Q. Despite the fact that the Hungarian couple was dead?
A. Yes.
Q. That was continued to be discussed?
A. Yes.
Q. And Mese's name was continued to be discussed?
A. Yeah.
* * * *
[7] And did you also say that there was going to be some type of a lawsuit filed against Mr. Griga?
A. Yes.
Q. Now was that in the Bahamas or was that going to be in the United States?
A. In the Bahamas.
Q. And were you going to retain the Bahamian counsel to file this lawsuit?
A. Mr. Lugo was trying to retain that counsel.
Q. Was it the same lawyer, do you know who formed a Elite International?
A. It wasn't the same lawyer.
Q. And when Mr. Lugo was going to talk to an attorney in the Bahamas about doing this he certainly wasn't going to tell the attorney that this was a false lawsuit, was he?
A. Correct?
Q. And Mr. Mese had nothing to do with the selection of that Bahamian attorney, either did he?
A. Not that I am aware of.
Q. And any monies that were going to be derived from that lawsuit were going to go through Elite International, your corporation, weren't they?
A. No they weren't.
Q. Where were they going to go through?
A. To D & J.
Q. D & J International?
A. Yes.
Q. Mr. Lugo's corporation.
A. And Mr. Mese.
* * * *
[8] See Rule, supra, footnote 3.
[9] If someone agrees with two other car thieves to assist them in selling stolen auto parts and the other two thieves murder and kidnap people, is the peddler of stolen auto parts now also guilty of murder and kidnap? By its ruling, the majority would say yes. I do not believe the case law supports that position.