983 So.2d 464 (2008)
Noel DOORBAL, Appellant,
v.
STATE of Florida, Appellee.
Noel Doorbal, Petitioner,
v.
Walter A. McNeil, etc., Respondent.
Nos. SC05-383, SC06-1490.
Supreme Court of Florida.
February 14, 2008.
Rehearing Denied May 27, 2008.
*469 Melodee A. Smith, Fort Lauderdale, FL, for Appellant/Petitioner.
Bill McCollum, Attorney General, Tallahassee, FL, and Sandra S. Jaggard, Assistant Attorney General, Miami, FL, for Appellee/Respondent.
PER CURIAM.
Noel Doorbal appeals an order of the circuit court that denied his motion to vacate his convictions of first-degree murder and sentences of death filed under Florida Rule of Criminal Procedure 3.851. Doorbal also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.

FACTS AND PROCEDURAL HISTORY
A jury convicted Noel Doorbal of first-degree murder (two counts), conspiracy to commit racketeering, racketeering, kidnapping (two counts), armed kidnapping, attempted extortion, grand theft (two counts), attempted first-degree murder, armed robbery, burglary of a dwelling, first-degree arson, armed extortion, and conspiracy to commit a first-degree felony. See Doorbal v. State, 837 So.2d 940, 951 n. 30 (Fla.2003). These convictions arose from the abduction, extortion, and attempted murder of Marc Schiller, and the abduction, attempted extortion, and murder of Frank Griga and Krisztina Furton. See id. at 944-50. For each murder, the jury recommended the death penalty by a vote of eight to four. See id. at 951. In accordance with that recommendation, the trial court sentenced Doorbal to death for both murders. See id. Although trial proceedings were consolidated with those of codefendants Daniel Lugo and John Mese, the charges against Doorbal and Mese were considered and determined by the same jury, while the charges against Lugo were evaluated by a separate jury. See Lugo v. State, 845 So.2d 74, 97 n. 31 (Fla.2003). While the factual circumstances surrounding these crimes are extensive (and are fully detailed in our opinion on direct appeal), a brief summary of the facts of the crimes follows.
The Schiller counts  Marc Schiller was a wealthy Miami businessman whose firm, in addition to other pursuits, provided services that were reimbursed by Medicare. See Doorbal, 837 So.2d at 951. Schiller hired Jorge Delgado to assist with the business, and Schiller eventually sold the Medicare-related portion of his business to Delgado. See id. During the period from September through October 1994, Daniel Lugo, a friend of Delgado who at times performed billing work for Schiller and Delgado, informed Delgado of his belief that Schiller had cheated them both. See id. at 945. Delgado asked Lugo to do whatever was necessary to recover the money that was owed to them. See id. Lugo enlisted Doorbal and two other individuals, *470 Stevenson Pierre and Carl Weekes, in a plot to kidnap Schiller, with the intent to force him to sign over assets equivalent in value to that which Delgado and Lugo believed was owed to them. See id. The opinion on appeal provides:
After several failed attempts to locate and capture Schiller, on November 15, 1994, the group finally succeeded in abducting him. . . . Doorbal and Weekes grabbed Schiller, and Weekes proceeded to subdue Schiller by shocking him with the stun gun. Another participant, Sanchez, assisted Doorbal and Weekes in forcing Schiller into a waiting van. Inside the van, Schiller was handcuffed and duct tape was placed over his eyes. A gun was placed at Schiller's head, and his wallet and jewelry removed as the van proceeded to a warehouse that Delgado had previously rented. Schiller received additional shocks with the stun gun and was kicked repeatedly. . . . Lugo arrived at the warehouse shortly after Doorbal and the others arrived with Schiller.
Schiller's captors demanded a list of his assets which Schiller initially refused to provide. The refusal resulted in his being slapped, shocked with the stun gun, and beaten with a firearm. Weekes questioned Schiller about his assets, based on information provided by Lugo and Delgado. Schiller testified that after he again refused to provide the requested information, he was told that he was going to engage in a game of Russian Roulette. . . .
The captors further threatened that if Schiller did not cooperate, his wife and children would also be abducted and his wife raped in his presence. Schiller was eventually compelled to agree to cooperate, but only if his wife and children were allowed to leave the country unharmed. In the ensuing days, Schiller began signing over his assets, including a quitclaim deed for his home, various documents granting access to his checking, savings, and IRA accounts, and authorization for changing the beneficiary of his million-dollar insurance policies.
During Schiller's captivity, Doorbal and Lugo entered Schiller's home and removed many furnishings and other items. Lugo, Delgado, and Weekes also began charging thousands of dollars to Schiller's credit cards. Money from the safe in Schiller's home was divided among Doorbal, Weekes, and Pierre. Three weeks into Schiller's captivity, Doorbal and Delgado convinced Lugo that Schiller must be killed, because he had likely surmised the identities of some, if not all, of his captors. . . . In the fourth week, Schiller was forced to consume large amounts of alcohol to make him intoxicated. Lugo drove Schiller's Toyota 4-Runner into a utility pole on a Miami-area street to create the impression that Schiller had been involved in an accident resulting from driving while intoxicated. Doorbal and Weekes also participated in this episode and Schiller was placed in the front seat of the 4-Runner after it had been driven into the pole. Lugo and Doorbal then poured gasoline on the vehicle and set it ablaze. Lugo, Doorbal, and Weekes had planned to exit the scene in another vehicle that Weekes had driven to the scene, but they noticed that Schiller had somehow managed to exit his burning vehicle, and was staggering in the roadway. . . . At the urging of Lugo and Doorbal, Weekes used his vehicle to . . . run over Schiller. The three left the scene of these events believing they had killed Schiller. . . .
Miraculously, Schiller survived this attempt to take his life and he was rescued. He remembered awakening in a Miami hospital with a broken pelvis, ruptured bladder, bruises and burns, *471 and temporary paralysis. Lugo and the others eventually learned that Schiller had survived, so they visited the hospital where they thought Schiller was recuperating, with a plan to suffocate him as he lay in his hospital bed. Unknown to Lugo and the others, based upon a well-founded fear for his safety, Schiller had already arranged to be airlifted to a New York hospital to complete his recuperation. Lugo, Doorbal, and some of the other captors proceeded to empty Schiller's home of the remaining furnishings and valuables.
Id. at 945-47 (footnotes omitted).
The Griga/Furton counts  Frank Griga was also a wealthy Miami businessman, and Krisztina Furton was his girlfriend. See id. at 948. When Doorbal learned of the significant wealth of Griga, he determined that Griga would be a prime target for kidnapping and extortion. See id. Doorbal convinced Lugo to participate with him in the crime. See id. After a phony business meeting with Griga[1] and a first failed abduction attempt, Doorbal and Lugo kidnapped Griga and Furton:
When Lugo and Doorbal returned to Griga's home on May 24, 1995, they had concocted the scheme of inviting Griga and Furton to dinner, with the further goal of luring them to Doorbal's apartment, where the abduction and extortion would begin. Between 10 and 10:30 p.m., Judi Bartusz, a friend and neighbor of Griga's, saw Lugo and Doorbal leave Griga's home in a gold Mercedes, while Griga and Furton left in the Lamborghini.
On May 25, Delgado met Lugo and Doorbal at Doorbal's apartment. Lugo informed him that Griga was already dead: Doorbal had killed Griga after the two became involved in a scuffle in and around the downstairs computer room in Doorbal's apartment. [n. 21] Griga's body had been placed in a bathtub in Doorbal's apartment. Lugo related that when Furton had heard the scuffling between Doorbal and Griga, she rose from her seat in the living room and began to scream when she realized that Griga had been seriously injured. Lugo restrained her and subdued her with an injection of Rompun. Lugo expressed his anger toward Doorbal for having killed Griga before the extortion plan had been completed.
[N. 21.] Delgado eventually noticed that blood was not only on the walls and carpet of the computer room, but also on much of the equipment and furnishings. The record also reflects that at some point before he was killed, Griga was injected with Rompun [a horse tranquilizer]. Dr. Allan Herron, a veterinarian, provided expert testimony that the presence of horse tranquilizer in Griga's brain and liver indicated that he was alive when he was injected. Rompun slows respiration and heart rate, and causes salivation, vomiting, and a burning sensation. Dr. Herron stated that there are no clinical uses for Rompun in humans.
Medical examiner Dr. Roger Mittleman testified that Griga was a homicide victim. While he could not pinpoint the exact cause of death, he opined that Griga died from one or more of the following causes: an overdose of horse tranquilizer; asphyxia from strangulation, with the overdose of horse tranquilizer contributing to the asphyxiating effect; or blunt force *472 trauma to his skull and the consequent bleeding (exsanguination) from this blunt force.
Lugo and Doorbal then turned their focus toward Furton. They suspected that she knew the code to enter Griga's home. Knowledge of the code would allow Lugo and Doorbal to enter Griga's home with the hope of gaining access to valuables and, most importantly, to bank account information for access to much of his wealth. Doorbal carried Furton down the stairs from the second floor of the apartment. Furton was barely clad, wearing only the red leather jacket that she had worn when she left Griga's home the night before and a hood covered her head. Not long after Doorbal placed Furton near the bottom of the stairs, although handcuffed, she began screaming for Griga. At Lugo's direction, Doorbal injected Furton with additional amounts of horse tranquilizer, causing her to scream again. Lugo and Doorbal then questioned Furton about the security code for Griga's home. Eventually, Furton refused to answer more questions. Doorbal injected her yet again. . . .
Armed with what he believed to be the access code for Griga's home security, Lugo took Petrescu [Lugo's girlfriend] to attempt entry while Doorbal and Delgado stayed behind. After failing to gain access to Griga's home, Lugo called Doorbal on his cellular phone. As the two talked, Petrescu heard Doorbal say, "the bitch is cold," which she believed was Doorbal's indication that Furton was dead. [n. 22]
[N. 22.] Dr. Mittleman, the medical examiner, opined that the effects from horse tranquilizer were consistent with the cause of Furton's death. He also stated that her death was consistent with asphyxia.
Id. at 948-50 (some footnotes omitted). Lugo and Doorbal subsequently dismembered the bodies of Griga and Furton, and, along with another individual, disposed of the body parts in two different South Florida locations. See id. at 951.
In imposing the death sentence for the Griga and Furton murders, the trial court found five aggravating factors and accorded each great weight: (1) Doorbal had been convicted of a prior violent felony; (2) the murders were committed to avoid arrest; (3) they were committed for pecuniary gain; (4) they were committed in the course of a kidnapping; and (5) they were cold, calculated, and premeditated (CCP). See id. In addition, the trial court found that the murder of Furton was heinous, atrocious or cruel and accorded that factor great weight. See id. at 952. With regard to mitigation:
the trial judge did not find any statutory mitigators, but did find six nonstatutory mitigators: that Doorbal had a difficult childhood, was a hard-working and loyal employee, was a loyal friend and positive influence on others, had religious devotion and the ability to help others with religious beliefs, exhibited appropriate courtroom behavior, and that life imprisonment would remove the menace to society. Each nonstatutory mitigator was accorded little weight.
Id.
On direct appeal, Doorbal raised the following issues: (1) warrants secured to search Doorbal's apartment, home, and vehicle were not supported by probable cause; (2) witnesses for the State made improper statements directed to the propensity of Doorbal to commit bad acts or to highlight his bad character; (3) during guilt phase closing arguments, the prosecutor improperly commented on Doorbal's right to remain silent and asserted a "golden rule" argument; (4) during penalty *473 phase closing arguments, the prosecutor improperly commented on mitigation evidence and argued to the jury that Doorbal should receive "no mercy"; (5) the trial court erroneously refused to admit letters to Doorbal that had been written by Lugo as evidence of mitigation; (6) the trial court erroneously found both the aggravating circumstances of pecuniary gain and murder committed while in the course of a kidnapping, which created an improper doubling because the aggravators arose from identical facts; (7) improper doubling occurred when the trial court erroneously found both the CCP and avoid arrest aggravating circumstances, both of which were without evidentiary support; and (8) Florida's capital sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). See 837 So.2d at 952-62. This Court denied relief on all claims and affirmed the convictions and sentences. See id. at 944.
On March 27, 2003, Capital Collateral Regional Counsel-South (CCRC) filed a motion to disqualify the trial judge, Alex Ferrer, asserting that after he imposed the death sentences in the instant case, he testified at the federal Medicare fraud sentencing hearing of victim Marc Schiller in favor of a more lenient sentence. On February 19, 2004, approximately four months before the filing deadline for the motion for postconviction relief, CCRC filed a motion to withdraw as counsel for Doorbal. The motion argued that the two CCRC attorneys assigned to represent Doorbal had resigned from CCRC, which necessitated the reassignment of over twenty-five cases. The motion asserted that "[t]he extraordinary volume of Mr. Doorbal's case makes reassignment an impossible task." During a March 5, 2004, hearing, the trial court denied the motion to disqualify as both untimely and legally insufficient. The trial court granted the motion to withdraw, and registry counsel was appointed to represent Doorbal on March 26, 2004.
On June 15, 2004, Doorbal filed a rule 3.851 motion to vacate his convictions and sentences, raising a large number of claims.[2] On November 9, 2004, the trial *474 court held a Huff[3] hearing. The trial court granted an evidentiary hearing on claim 8(f) (the mental health evaluation claim) but denied the other claims as either meritless, procedurally barred, or insufficiently pled.[4] At that time, the trial court set the evidentiary hearing for February 14, 2005. During a December 21, 2004, hearing, the trial court denied a request by Doorbal to stay the postconviction proceedings. During a status hearing on January 10, 2005, the trial court denied a request by Doorbal for a continuance. In mid-January 2005, Doorbal filed another motion for continuance, in which he contended that the mental health experts needed more time and information to complete their evaluations. On January 20, 2005, the trial court denied that motion, and counsel for Doorbal thereafter filed a written statement with the court in which she outlined that she would not call any witnesses to testify during the evidentiary hearing. The trial court questioned Doorbal as to whether he agreed with the decision of counsel to present no witnesses, and Doorbal stated that he agreed because more time was needed to develop the claim. The trial court then informed Doorbal:
Now, one thing I want you to understand is this may be a tactic to say, to show the Supreme Court that you really feel that you need more time. I can't tell you that the Supreme Court is going to receive it the way that you hope that they are going to treat it, okay. When your lawyer came into the case in May I specifically told her that you are not going to get additional time. And she was substituting for another lawyer and she said that she had discussed it with you and that you guys had discussed the fact that you had time deadlines and you had to abide by those time deadlines, okay. And we have in some respects I have given her extensions for these doctors where I could. But the hearing is set for February 14 and she has come here and she has asked me to reset it and grant a continuance and I have told her that I am not going to do that, okay. It could be that when you go up on appeal to the Florida Supreme Court that they say too bad, you could have put on evidence and we could have decided whether you need more time or not, but you waived it by saying we are not going to put on any evidence. I don't know what they are going to say. *475 But that is possible. They could say that, you understand that?
Doorbal verified that he understood. During a February 5, 2005, hearing, Doorbal again verified that he did not wish to present witnesses at the evidentiary hearing that had been scheduled for February 14, 2005.
After affording the opportunity for an evidentiary hearing, the trial court concluded that Doorbal had failed to produce a primary basis for relief on claim 8(f) and denied the claim. On February 16, 2005, the trial court entered an order denying Doorbal's amended 3.851 motion. In response to a motion for clarification, the trial court entered an amended denial order on February 24, 2005. Doorbal now appeals the denial of his motion and presents six claims on review. Doorbal also petitions this Court for a writ of habeas corpus, in which he raises eleven claims for relief.

MOTION FOR POSTCONVICTION RELIEF

Motion to Disqualify
In his first claim, Doorbal asserts that Judge Ferrer erroneously denied his motion to disqualify as both untimely and legally insufficient. While we agree with Doorbal that the motion to disqualify was timely filed, we conclude that the motion was properly denied.
Timeliness  Florida Rule of Judicial Administration 2.160, which governed the disqualification of trial court judges at the time the motion to disqualify was filed, provided that "[a] motion to disqualify shall be filed within a reasonable time not to exceed 10 days after discovery of the facts constituting the grounds for the motion and shall be promptly presented to the court for an immediate ruling." Fla. R. Jud. Admin. 2.160(e) (2004).[5] Whether a motion to disqualify a trial judge has been timely filed generally involves a factual determination and, therefore, is reviewed under the competent, substantial evidence standard. See Amato v. Winn Dixie Stores/Sedgwick James, 810 So.2d 979, 981 (Fla. 1st DCA 2002).
The motion to disqualify filed on March 27, 2003, stated:
Undersigned counsel filed his Notice of Appearance as Mr. Doorbal's counsel on March 18, 2003. Although undersigned counsel has not received any records on Mr. Doorbal's case as of today's date, preliminary research indicates that subsequent to Mr. Doorbal's conviction and sentence, Mr. Schiller was charged and ultimately pled guilty to felony federal charges. During Mr. Schiller's federal sentencing hearing, Judge Ferrer testified on behalf of Mr. Schiller as a witness.
The basis for this statement was a January 2000 article titled "Pain and Gain" from the Miami New Times, a local periodical. This information was discovered "soon after" counsel entered the notice of appearance. The State speculates as to various reasons that CCRC counsel could have, or should have, acquired this information prior to the entering of the notice of appearance in the postconviction proceedings; however, rule 2.160 establishes timeliness based on when the information was actually discovered. See Fla. R. Jud. Admin. 2.160(e).
Counsel filed the motion to disqualify only nine days after he filed his notice of appearance, and we conclude that the motion was timely filed within the ten-day *476 deadline provided in rule 2.160(e). Although the motion to disqualify fails to reveal the precise date that the federal testimony was discovered, there is no evidence that an attorney for CCRC would commence research of the case of a capital defendant (much less the criminal history of one of the victims of the defendant) before being assigned to represent that capital defendant. Thus, it is reasonable to conclude that counsel did not discover the testimony of Judge Ferrer until after the notice of appearance was filed. The State has failed to provide any concrete evidence to rebut the assertion that counsel discovered the testimony on behalf of Schiller only after filing a notice of appearance in the instant case. We conclude that the holding of the trial court that the motion to disqualify was untimely is not supported by competent, substantial evidence.
Fear of bias/prejudice  On the merits of the motion to disqualify, Doorbal contends that Judge Ferrer's testimony on behalf of Schiller during the federal proceedings demonstrated bias against Doorbal. The transcript of the Schiller sentencing hearing reveals that Judge Ferrer testified that Schiller was a crucial witness with regard to the crimes committed against him, and also during consideration of the penalty phase in connection with the Griga/Furton charges. His testimony included the trial description of the abduction, extortion, and attempted murder of Marc Schiller. In response to the questioning, Judge Ferrer expressed his impression from the trial evidence with regard to the ordeal endured by Schiller:
I'm a firm believer that punishment is only punishment if it's imposed by the government or by the state as a result of the crime committed.
. . . And an armed robber commits an armed robbery and complains to me that he got shot as a result of the armed robbery by the victim, I generally view it as an occupational hazard.
It's not a form of punishment, I don't give him any credit for it towards his sentence. For some reason, I feel this case is different. I can't tell you why. I don't know a legal reason why.
I know that we can consider anything at sentencing. This case was a very emotional case to sit through. It still bothers me to some extent. And I know that if things were just black and white, they could have computers do our jobs.
But there's something intangible about this case that makes me feel like what he went through should be given some credit, because I don't think it could have been any worse if he was a prisoner of war.
Doorbal asserted that as a result of this federal trial testimony, he possessed a well-founded fear that Judge Ferrer would not be fair and impartial during these postconviction proceedings.
This Court reviews a trial court determination on whether a motion for disqualification is legally sufficient de novo. See Chamberlain v. State, 881 So.2d 1087, 1097 (Fla.2004). Under former rule 2.160, a motion to disqualify must demonstrate "that the party fears that he or she will not receive a fair trial or hearing because of specifically described prejudice or bias of the judge." Fla. R. Jud. Admin. 2.160(d)(1) (2004). The facts alleged in a motion to disqualify must demonstrate that the party has a well-grounded fear that he will not receive a fair trial before the judge. See Livingston v. State, 441 So.2d 1083, 1087 (Fla.1983).
We have carefully considered the testimony of Judge Ferrer during the federal court sentencing hearing, and we conclude that it fails to establish a well-grounded *477 fear on the part of Doorbal that he would not receive a fair hearing. In Waterhouse v. State, 792 So.2d 1176, 1192 (Fla.2001), the trial judge issued a much more egregious statement to the Florida Parole and Probation Commission to the effect that "the subject is a dangerous and sick man and that many other women have probably suffered because of him." We rejected the claim that such a statement by a trial court judge provided a basis for the recusal of the trial judge in subsequent proceedings:
[T]he comment to the Commission did not constitute a prejudgment of any pending or future motions that the defendant might file, and was not made outside the official post-sentence investigative process in a manner indicating a predisposed bias against the defendant. Given the facts in this case, the statement to the Commission indicates nothing more than the judge's opinion after having heard evidence relating to two exceedingly cruel and brutal murders of women who were sexually assaulted. The circumstances of these murders, coupled with Waterhouse's own admission that he had a "problem with sex and violence," would lead any reasonable person to conclude that Waterhouse is a "dangerous and sick man."
Id. at 1195; see also Rivera v. State, 717 So.2d 477, 480-81 (Fla.1998) (finding that the written response by the trial judge to a parole commission inquiry that "I am inalterably opposed to any consideration for Executive Clemency and I believe the sentence of the court should be carried out as soon as possible" was insufficient to disqualify the judge from further presiding over the case); cf. Suarez v. Dugger, 527 So.2d 190, 192 n. 1 (Fla.1988) (trial court erred when it denied a motion to disqualify where a newspaper article reported that the judge was pleased with the decision of the governor to sign a death warrant for the defendant and that he did not "believe that [Suarez's] case merits postponements").
The testimony before to the federal sentencing court here did not specifically reference Doorbal at any point. We conclude that nothing in the testimony constituted a prejudgment of any pending or future motions that Doorbal might file in Judge Ferrer's court, nor were any statements by Judge Ferrer indicative of a predisposed bias against Doorbal. Cf. Suarez, 527 So.2d at 192 n. 1. Instead, Judge Ferrer merely responded to the impact of the evidence that was presented during the murder trial with regard to the brutal abduction, torture, and attempted murder that Schiller suffered over a period of almost a month. We conclude that the facts of this case would lead any reasonable person to conclude that the experience of Schiller was traumatic and not entirely unlike that of a prisoner of war.
Moreover, our decision is additionally guided by the fact that every judge who is vested with the responsibility to preside over postconviction proceedings of a capital defendant after he or she has presided over the original trial will have issued a detailed sentencing order that, under Florida law, requires that details of the facts of the crimes committed by the defendant be set forth and weighed by both the judge and jury. Indeed, in the present case, when Judge Ferrer found the existence of the prior violent felony aggravator, he provided extensive facts in the sentencing order, as he was required to do, with regard to the physical and psychological torture endured by Schiller during his abduction. A number of the statements that Judge Ferrer included in the state court final sentencing order were simply repeated during the federal sentencing hearing. If a statement or characterization by a trial judge with regard to the facts of a capital case was sufficient to require the disqualification *478 of that judge, then any and all judges who preside over capital trials could never preside over the postconviction proceedings for that same defendant because statements in the sentencing order would create a fear of bias on behalf of the defendant and a legal basis for disqualification. We decline to mandate such widespread disqualification of judges in capital cases.
In light of the foregoing, we conclude that the trial court properly denied the motion to disqualify as legally insufficient. See Waterhouse, 792 So.2d at 1195. Nonetheless, we do emphasize that we do not encourage trial judges to testify on behalf of a victim from one of their prior criminal cases with regard to the ordeal of the victim in that prior case. Judges in Florida are required to maintain an appearance of impartiality. See Fla.Code Jud. Conduct, Canon 3. A judge may be unnecessarily forced to walk a fine line when he testifies with regard to how the evidence of the suffering of a victim in a case impacted him.

Motion to Depose
Doorbal next asserts that the trial court erroneously denied his motion to depose the assistant state attorneys (ASAs) who were involved in Doorbal's criminal trial. Doorbal contends that he had good cause to depose the ASAs because during postconviction discovery, Doorbal located an email from ASA Gail Levine to her supervisor that indicated the State was aware that Schiller was under investigation for Medicare fraud.[6] Therefore, Doorbal contends that, during the trial, the State both withheld exculpatory Brady[7] evidence (i.e., that Schiller was guilty of Medicare fraud) and committed a Giglio[8] violation because it allowed Schiller to falsely testify that he was not guilty of Medicare fraud. Doorbal asserts that deposition of the ASAs was necessary to reveal additional evidence of the claim.
In response, the State asserts that no Brady or Giglio violation ever occurred, and, therefore, Doorbal is neither entitled to relief on his claim of such violations, nor can he demonstrate that the trial court abused its discretion when it denied the motion to depose. Since the validity of the motion to depose hinges on whether a Giglio or Brady violation occurred during the trial, and because Doorbal asserts that the summary denial of the Giglio and Brady claims was error, we review the history of the proceedings in this case with regard to the purported involvement of Marc Schiller in Medicare fraud.
History
During the guilt phase of Doorbal's trial, in response to questioning, Marc Schiller *479 denied that he was guilty of Medicare fraud. After Doorbal was convicted, Schiller subsequently returned to the United States from Colombia to testify at the Spencer[9] hearing with regard to how the crimes committed against him have impacted his life. Prior to the testimony, the State informed the Court and the attorneys at sidebar that officers from the federal government were outside the courthouse, and when Schiller finished his testimony, he would be taken into federal custody on charges of Medicare fraud.
Doorbal subsequently filed a motion for new trial in which he contended that the State had failed to disclose the federal investigation and pending criminal charges against Schiller. Doorbal alleged that during the penalty phase, the State made references to the Schiller kidnapping as a substantial aggravator and that had knowledge of a pending federal indictment against Schiller been known, it could have been presented to the jury and would have had a substantial impact on whether the prior violent felony aggravator weighed in its decision. During the hearing on the motion for new trial, the court asked counsel for codefendant Mese:
Do you have any evidence that the State knew, never mind suspecting I think that everyone suspected Schiller was being investigated. Everybody knew that Delgado was being investigated. How could Delgado be investigated and his partner not be investigated. That denies [sic] logic. I think everyone suspected that.
The trial court asked counsel for codefendant Lugo what information demonstrated that the State knew Schiller had lied when he testified that he was not guilty of Medicare fraud. Counsel for Lugo responded that he could not know until he deposed ASA Levine. The trial court asked whether the defense would find that the State had evidence or knowledge that Schiller was guilty of federal crimesthe court recognized that everyone involved with the trial suspected that Schiller was being investigated and was involved. The trial court then noted that Schiller had been impeached by Delgado, who stated that Schiller was involved in criminal conduct. The court then reasoned that even if Schiller knew he was under investigation, he was not required to admit guilt. Also, this testimony "occurred during a trial and the cross-examination process is specifically for the purpose of weeding out whether someone is lying under oath." The trial court then afforded ASA Levine the opportunity to speak with regard to the allegations. She stated:
I have absolutely no information about the Federal investigation except for the fact that they were speaking to Mr. Delgado and Mr. Delgado was telling me that he committed the Medicare Fraud with Mr. Schiller and those were the conversations I had and that I shared with the Federal Government that they knew, which made Mr. Schiller in my mind, what I knew was the same thing that the defense knew exactly.
The trial court ultimately held that no violation occurred and noted that, even if such a violation had occurred, there was no evidence that the violation was intentional.
After Doorbal's conviction was affirmed, and during postconviction discovery, Doorbal located the e-mail from ASA Levine to her supervisor that prompted Doorbal to file the motion to depose. The trial court ultimately concluded that good cause did not exist to depose the ASAs based upon the e-mail:

*480 [T]he defense all throughout the trial was saying that they were certain that he was under investigation, that they felt that the State knew that he was under investigation, that they felt that he knew that he was under investigation. I don't know how if he did or didn't, how can the defense come in and say, claim surprise.
Analysis
To establish a Brady violation, a defendant has the burden to show (1) that favorable evidenceeither exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. See Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see also Way v. State, 760 So.2d 903, 910 (Fla. 2000). A Giglio violation is demonstrated when (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. See Guzman v. State, 941 So.2d 1045, 1050 (Fla.2006). We conclude that Doorbal has failed to establish either a Brady or a Giglio violation and, therefore, the trial court did not err when it summarily denied this claim without an evidentiary hearing.
First, Doorbal has failed to demonstrate that the State suppressed or withheld impeachment evidence. As noted by the trial court, allegations that Schiller was involved in Medicare fraud with Delgado were spread throughout the trial. During an October 23, 1997, hearing at which the trial judge addressed what questions Delgado would be compelled to answer in his deposition, counsel for a codefendant stated "[a]s soon as [Delgado] is done testifying he will be indicted and Mr. Schiller will be indicted and there's no one in this courtroom that thinks any different. Once these trials are over they're federal defendants." During the same hearing, ASA Levine asserted that the codefendants "know there is some kind of investigation. They're all hoping to find out where Schiller fits in," and referred to Schiller as the "alleged kingpin." Finally, during Doorbal's trial, Delgado testified on cross-examination with regard to Schiller's involvement in the alleged Medicare fraud scheme. We, as did the trial court, reject the assertion that Doorbal is entitled to relief on a contention that he did not know that Schiller was allegedly involved in improper Medicare activity or was being investigated by the federal government for Medicare fraud when the record is replete with these allegations in open proceedings in which Doorbal participated. See Maharaj v. State, 778 So.2d 944, 954 (Fla.2000) ("[A] Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant").
Doorbal has completely failed to demonstrate that the State knew Schiller offered false testimony. As the record reveals, everyone (including the codefendants and the trial court) suspected that Schiller engaged in Medicare fraud and that the federal government had Schiller under investigation. However, Schiller was not indicted for Medicare fraud, nor did he plead guilty to Medicare fraud, until after Doorbal was convicted. In the instant proceedings, Doorbal has failed to provide any evidence that the State possessed evidence that Schiller was guilty of Medicare fraud at the time of the trial, and then allowed him to testify to the contrary. Absent evidence to demonstrate that the State unquestionably had evidence and knew that Schiller was guilty at the time that he testified, we conclude that Doorbal has failed to demonstrate that a Giglio *481 violation occurred. See Rodriguez v. State, 919 So.2d 1252, 1270 (Fla.2005) (finding no Giglio violation where the defendant had not shown "that the prosecutor had any knowledge of allegedly false testimony").
Finally, even if the State withheld evidence or knew that Schiller testified falsely (which it did not), Doorbal cannot demonstrate prejudice under Brady or Giglio. Under Brady, nondisclosure of impeachment evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. See Ventura v. State, 794 So.2d 553, 563 (Fla.2001). Under Giglio, false testimony is material if there is a reasonable probability that the false evidence affected the judgment of the jury. See id. Doorbal sought to introduce evidence of Schiller's Medicare fraud in an attempt to demonstrate that Schiller was a dishonest witness who should not be believed by the jury. Nonetheless, even if Doorbal had been allowed to impeach Schiller with this testimony, we conclude that neither of the above standards for prejudice would have been satisfied. Id.
First, during trial, Delgado impeached the testimony of Schiller on this specific issue. Second, the testimony of Schiller with regard to his abduction and kidnapping was corroborated by Delgado, who provided a detailed explanation of the plot to kidnap Schiller and extort his assets. Delgado admitted that Schiller was held in a warehouse that Delgado leased, and that during the kidnapping Delgado had the responsibility to remain at the warehouse to watch Schiller. Delgado testified that during Schiller's kidnapping, Doorbal beat Schiller, slapped him, and burned his skin with cigarettes to obtain information about his assets.
Delgado testified that when the codefendants decided to kill Schiller, Lugo, Doorbal, and two others placed Schiller in a car and set it on fire. According to Delgado, Lugo explained that after the fire erupted, Schiller managed to escape the burning vehicle. He then admitted to Delgado that they ran Schiller over twice with his (Lugo's) car. When Delgado informed Lugo that he did not believe Schiller would have died from his injuries, Lugo began to phone hospitals to see if Schiller had been admitted. During the trial, a photograph of Schiller's scorched vehicle was introduced into evidence. Finally, as noted in the opinion of this Court on direct appeal, "[w]hen warrants were executed at Doorbal's apartment, police found the following: computer equipment and jewelry belonging to Schiller, receipts for purchases on Schiller's credit card, a receipt relating to the changing of locks at Schiller's home, and handcuffs." Doorbal, 837 So.2d at 947 n. 12.
Given the significant evidence presented at trial that corroborated the ordeal experienced by Schiller at the hands of Doorbal and Lugo, we conclude that even if additional evidence of Schiller's involvement in improper Medicare activity had been presented to the jury, there is no reasonable probability that the outcome of this trial would have been different. See LeCroy v. Dugger, 727 So.2d 236, 239 (Fla.1998) (no Brady violation occurred where the evidence presented at trial was so overwhelming that there was no reasonable probability that outcome would have been different had the State disclosed the evidence). Similarly, this evidence, and the fact that Delgado did present evidence which called the credibility of Schiller into question, demonstrates that there is no reasonable probability that any false testimony by Schiller affected the judgment of *482 the jury.[10]
In light of the foregoing, we conclude that no Brady or Giglio violation occurred during the trial proceedings. Therefore, we hold that the trial court did not abuse its discretion when it denied the motion to depose the ASAs.

Summary Denial of Postconviction Claims
Under this claim, Doorbal contends that the trial court erroneously denied all but one of his claims without an evidentiary hearing. However, we conclude that this issue is insufficiently pled. This Court has held that vague and conclusory allegations on appeal are insufficient to warrant relief. For example, in Smith v. State, 931 So.2d 790, 800 (Fla.), cert. denied, ___ U.S. ___, 127 S.Ct. 587, 166 L.Ed.2d 436 (2006), the defendant contended in his brief that during the evidentiary hearing, the trial court improperly precluded him from presenting "some evidence" on some of his Brady and Giglio claims. This Court rejected the claim for two reasons, one of which was that the contention was vague and conclusory. See id. We noted that in the initial brief, the defendant did not identify any evidence that was improperly excluded, nor did he specify any claim that the court wrongfully excluded from the evidentiary hearing. See id. Further, this Court has stated that the purpose of an appellate brief is to present arguments in support of the points on appeal. See Randolph v. State, 853 So.2d 1051, 1063 n. 12 (Fla.2003). Therefore, to merely refer to arguments presented during the postconviction proceedings without further elucidation is not sufficient to preserve issues, and these claims are deemed to have been waived. See id.
With regard to this issue, the argument by Doorbal is entirely conclusory. Doorbal provides a timeline of the case and details the standard to be applied for review of the summary denial of claims, but the remainder of his argument with regard to this claim consists of the following:
Doorbal's Motion to Vacate Judgments of Convictions and Sentences, trial court error, prosecutorial misconduct and effective assistance of counsel claims in Doorbal's Rule 3 were raised in his Motion to address a pattern of deficient conduct demonstrated by counsel and because this Court was forced to apply a fundamental error analysis when reviewing unpreserved claims raised on Doorbal's direct appeal.
In this case, the trial Court summarily denied Doorbal's claims without an evidentiary hearing and failed to provide this Court with an Order stating its rationale or attaching to its Order those specific parts of the record that refute each claim presented in the motion.
Doorbal neither states the substance of any of the claims that were summarily denied, nor provides an explanation why summary denial was inappropriate or what factual determination was required on each claim so as to necessitate an evidentiary hearing. We conclude that this general, conclusory argument is insufficient to preserve the issues raised in the 3.851 motion, *483 and, therefore, this claim is waived. See Randolph, 853 So.2d at 1063 n. 12.
In light of this conclusion, we are compelled to remind attorneys who represent capital defendants of the importance of compliance with minimal pleading requirements to allege a claim of ineffective assistance of trial counsel. In Downs v. State, 453 So.2d 1102, 1104-05 (Fla.1984), this Court explained that a defendant who seeks to present such a claim must (1) identify a specific omission or overt act upon which the claim is based, (2) demonstrate that the omission or act was a substantial deficiency which fell measurably below that of competent counsel, and (3) demonstrate that the deficiency probably affected the outcome of the proceedings. If a capital defendant fails to plead in accordance with these criteria, the claim will not meet the threshold for facial sufficiency. As a result, claims may not receive an evidentiary hearing or be considered by the trial court on the merits.
Various claims raised by Doorbal in this 3.851 proceeding were plagued by a lack of sufficiency in that Doorbal failed to allege a specific omission or overt act upon which his claim of ineffective assistance was based. For example, in claim 8(a), Doorbal contended that the death of the father of trial counsel Anthony Natale immediately prior to trial and the illness of his mother interfered with his representation of Doorbal and caused him to render ineffective assistance. During the Huff hearing, the trial court refused to grant an evidentiary hearing on claim 8(a) because Doorbal had not specified actions which counsel Natale failed to take during the trial:
COURT: I don't think I need an evidentiary basis for [claim 8(a)]. I think that an attorney can for whatever reason fail to preserve error, and that is the problem, and an attorney could also have his father die and do a completely effective trial the next day and not have error at all. So I don't think that [8(a)] is really the key point.
COUNSEL: What did your Honor just say? An attorney's father could die and you could
COURT: And he could proceed to trial the next day and do a completely effective job.
COUNSEL: Did you decide a case where that happened?
COURT: No, I am not citing a case. What I am saying is that it is not a factual issue of whether the attorney was so disturbed at the death of his father or the attorney and their father had a very lousy relationship and he really didn't feel displaced that his father had passed away, that is not the factual issue. The factual issue is did the attorney provide sub-par representation. And if he did, he did. And if he didn't, he didn't. Regardless of whether his father had passed away or his mother had passed away.
. . . I don't see it.
Later in the hearing, the trial court elaborated that the only omissions alleged by Doorbal were the failure of counsel Natale to object to trial court error and prosecutorial misconduct, but that these claims of error had been raised on direct appeal, and this Court determined that these omissions did not rise to the level of reversible error. See Doorbal, 837 So.2d at 954-59. Therefore, the trial court concluded that these omissions could not serve as a basis for a claim of ineffective assistance of counsel.
During oral argument before this Court, counsel for Doorbal asserted for the first time that counsel Natale was ineffective because, due to the poor health and ultimate death of his father, he was not present at "most" of the witness depositions. *484 When asked how many depositions counsel Natale failed to attend, postconviction counsel could not provide the number. Instead, counsel responded that she would have obtained that information had Doorbal been granted an evidentiary hearing on this claim.
As the foregoing demonstrates, the rule 3.851 proceedings in the trial court, and on appeal before this Court, have been plagued by generality and lack of specificity. Counsel for Doorbal appears to operate under the incorrect assumption that conclusory, nonspecific allegations are sufficient to obtain an evidentiary hearing on claims of ineffective assistance of counsel, and specific facts and arguments need not be disclosed or presented until the evidentiary hearing. We strongly reiterate to those who represent capital defendants in postconviction proceedings that claims of ineffective assistance of counsel must comply with the pleading requirements enunciated by this Court in Downs at the time that the initial rule 3.851 motion is filed to be legally sufficient under the rule.

The Amended Rule 3.851 Motion
Under this claim, Doorbal contends that although he timely served an amended rule 3.851 motion, the trial court only allowed him to amend the mental health claim and improperly struck the remaining portion of the amended motion. We conclude that this claim is without merit. Florida Rule of Criminal Procedure 3.851(f)(4) provides in pertinent part:
A motion filed under this rule may be amended up to 30 days prior to the evidentiary hearing upon motion and good cause shown. The trial court may in its discretion grant a motion to amend provided that the motion sets forth the reason the claim was not raised earlier and attaches a copy of the claim sought to be added.
(Emphasis supplied.) The refusal of a trial court to grant a party leave to amend a 3.851 motion is reviewed under an abuse of discretion standard. See generally Bryant v. State, 901 So.2d 810, 817 (Fla.2005) (stating that the Court "review[s] discretionary acts by trial judges under an abuse of discretion standard" and holding that "the trial court abused its discretion in striking the initial motion without granting leave to amend"). The record reflects that Doorbal mailed his amended motion to the trial court on Saturday, January 15, 2005. Thus, the earliest the trial court could have possibly considered this motion was on Tuesday, January 18, 2005, twenty-seven days before the evidentiary hearing.[11] Accordingly, Doorbal's amended motion was untimely filed under rule 3.851(f)(4).
It should be noted that during the Huff hearing held on November 9, 2004, postconviction counsel actually recognized that the thirty-day deadline to amend the 3.851 motion fell on Friday, January 14, 2005, and the trial court warned Doorbal that amendment to any claim other than claim 8(f), the mental health claim, might not be permitted:
COUNSEL: I have up to 30 days before the evidentiary hearing to amend the claims and I intend to do so.
COURT: I think your amendment is probably going to be limited to the claim that I did not deny an evidentiary hearing on.
COUNSEL: That is your position. Let me do my thing. So January 14th, is that our understanding that claims shall not be amended after that report day?

*485 STATE: For [the mental health] claim.
Despite the untimeliness of the amended rule 3.851 motion, the trial court permitted Doorbal to amend claim 8(f), the only claim upon which an evidentiary hearing was granted. We conclude that the trial court did not abuse its discretion in denying Doorbal's request to amend the remaining portions of his initial 3.851 motion, especially in light of the fact that Doorbal agreed that the last day to amend the motion fell on January 14, 2005, over two months prior to that deadline.
Moreover, this Court has held that "[a] defendant may not raise claims of ineffective assistance of counsel on a piecemeal basis by refining his or her claims to include additional factual allegations after the postconviction court concludes that no evidentiary hearing is required." Vining v. State, 827 So.2d 201, 212 (Fla.2002) (concluding that trial court did not err in denying rehearing of an order granting an evidentiary hearing on only one claim where defendant on rehearing "for the first time made factual allegations relating to his claim that counsel was ineffective in investigating and presenting mental health mitigating evidence"). In his amended motion, Doorbal did not seek to introduce any new claims. Rather, the amended motion consists of the original motion replicated nearly verbatim, but various claims are supplemented with additional facts. We conclude that Doorbal's amended motion contains the type of post-Huff hearing "piecemeal" supplementation that we condemned in Vining. See 827 So.2d at 212.
More importantly, some of the added facts are merely repetitious of assertions that Doorbal has made throughout the postconviction process. For example, in claim 3 (the denial of public records claim), Doorbal asserts in his amended motion that three e-mails between state attorneys were discovered in 140,000 pages of public records and alleges that "over the eight-year time frame that the State has been involved in this case there are more than three e-mails available for review." During the hearing to depose the ASAs held on July 9, 2004, more than five months before the amended motion was filed, counsel for Doorbal referenced the e-mail from ASA Levine and stated "I have one e-mail but I guarantee you that there is more than one e-mail. And [the State's] confidential work argument is not going to fly against a Brady and Giglio claim that I have."
Other facts asserted in the amended motion are vague and nonspecific. For example, in the amendment to claim 8(c) (counsel was ineffective for failing to investigate claims of innocence with regard to the Schiller counts), Doorbal asserted that his trial counsel "failed to provide Mr. Doorbal with a crime scene expert who would have been able to testify to the implausibility of testimony provided by the State." Doorbal failed to specify what testimony provided by the State could have been undermined by a crime scene expert. In his amendment to claim 8(d) (counsel was ineffective for failing to investigate claims of innocence with regard to the Griga/Furton counts), Doorbal asserts that "Delgado stated that another person had knowledge about the crimes against Mr. Griga and Ms. Furton, but trial counsel failed to follow up on his questioning with Mr. Delgado or investigate statements made by Mr. Delgado." Doorbal does not name who this other person was or what information this person allegedly possessed with regard to the Griga/Furton counts.
In light of the foregoing, we conclude that the trial court did not abuse its discretion in refusing to allow Doorbal to amend those claims upon which an evidentiary hearing was not granted.

*486 Motion to Continue

Doorbal next contends that the trial court erroneously denied his motion for a continuance of the postconviction proceedings. The postconviction mental health experts retained to evaluate Doorbal had reported to the trial court that they would not be able to complete a review and prepare expert opinions on or before the date of the evidentiary hearing. In light of this fact, Doorbal asserts that the trial court should have continued the proceedings so that the experts could complete their evaluations.
With regard to motions for continuance, this Court has stated:
A court's ruling on a motion for continuance will only be reversed when an abuse of discretion is shown. An abuse of discretion is generally not found unless the court's ruling on the continuance results in undue prejudice to the defendant. This general rule is true even in death penalty cases. While death penalty cases command our closest scrutiny, it is still the obligation of an appellate court to review with caution the exercise of experienced discretion by a trial judge in matters such as a motion for a continuance.
Hernandez-Alberto v. State, 889 So.2d 721, 730 (Fla.2004) (citations omitted) (quoting Israel v. State, 837 So.2d 381, 388 (Fla. 2002); Cooper v. State, 336 So.2d 1133, 1138 (Fla.1976)). We have held that it was not an abuse of discretion for a trial court to deny a motion for continuance of a postconviction evidentiary hearing where counsel filed a motion to depose two witnesses thirteen days before the evidentiary hearing. See Scott v. State, 717 So.2d 908, 912 (Fla.1998). We explained:
The decision of this Court was issued March 16, 1995, and Scott knew from that time that Coffin's and Dixon's statements would be in issue during the hearing. Scott, however, did little to secure the testimony of these witnesses until the eve of the evidentiary hearing and used this as a basis for seeking a delay. We find no abuse of discretion in denying the motion for a continuance at that late date.
Id. The State contends that denial of the requests for continuance of the evidentiary hearing by Doorbal did not constitute an abuse of discretion because the requests were necessitated by the delays of counsel. To evaluate whether counsel for Doorbal engaged in dilatory tactics, we present a timeline of the proceedings in this case.
Timeline
The actions that counsel took prior to the Huff hearing are not well documented in the record on appeal of the postconviction proceedings. An invoice for attorney expenses dated April 28, 2004, indicates that counsel for Doorbal agreed to accept the appointment on March 18, 2004. According to the invoice, between the dates of March 18 and April 2, counsel interviewed Doorbal, read the opinion on direct appeal, met with CCRC counsel, met with her investigator and a paralegal, and participated in two court conferences. On June 1, 2004, counsel filed motions seeking the release of records from the Records Repository and the Office of the State Attorney. On June 15, 2004, counsel filed the 3.851 motion to vacate. That same day, counsel also filed the motion to depose the assistant state attorneys. According to a letter from the Department of Financial Services, between June 16 and October 25, 2004, counsel billed 494.4 hours for representation of Doorbal. The majority of these hours were dedicated to the following tasks: the review of public records (240 hours), research of case law and facts, as well as the preparation of a response to the State's opposition to the motion (100 *487 hours), and review of the notes and files of trial counsel (100 hours).
During the Huff hearing held on November 9, 2004, the trial court granted Doorbal an evidentiary hearing on only one of his claims. At that time, counsel for Doorbal moved for a continuance. When the trial court suggested that a thirty-day time period was sufficient for the mental health experts to complete their evaluations, counsel objected and asserted that thirty days was not enough time because "these experts deserve the opportunity to go through some of the documents that I gave them. This is a massive documentary case." When counsel requested between sixty and ninety days to complete testing, the trial court granted Doorbal sixty days, but indicated that there would be no further extensions. The trial court urged that counsel stress to the experts the importance of completing the evaluations in a timely manner, and further informed counsel that if the retained experts could not evaluate Doorbal within the time constraints, she should retain others who could. The trial court then ordered that all mental health reports be provided to the State by January 10, 2005. The trial court then scheduled the evidentiary hearing for February 14, 2005. During a November 16, 2004, hearing, counsel requested that Doorbal be transported to Miami-Dade County rather than requiring the experts to travel to Florida State Prison to evaluate him. The trial court instructed the parties that the matter would have to be scheduled for a hearing at which Florida Department of Corrections officials could appear.
On December 21, 2004, counsel for Doorbal requested a stay of the proceedings in light of the fact that she had not been paid for months. The trial court advised counsel that he would do everything possible to ensure that she received payment, but he would not stay the case. The trial court then stated to counsel:
[W]hen you took this case I remember having a discussion with you that there is [sic] not going to be any more delays on this case. You recognized when you stepped into this case at that point I was not going to extend any guidelines [sic] and you explained that to Mr. Doorbal. And the answer was yes, yes, yes, I will work with you as much as I can.
At that time, counsel asserted that the experts still had not seen Doorbal because she had not been able to provide the records to them. Counsel also explained that she would prefer for the experts to review the records before they commenced their evaluations of Doorbal. The trial court refused to delay the evidentiary hearing. During a subsequent hearing on December 23, 2004, at the request of counsel, the trial court ordered that Doorbal be transported to Miami-Dade County for evaluation by mental health experts.
On January 10, 2005, the date that the trial court ordered the evaluations to be completed, counsel for Doorbal reported:
Our experts have already been in to see him to begin their interviews and examination. This will continue this week and probably next week and depending on the outcome of their analysis I will need to decide whether or not I need further examination.
Counsel stated that one of the experts would have her first appointment with Doorbal on January 11, and that another expert would only need to meet with Doorbal one more time. During that same hearing, Doorbal sought another continuance, contending that rule 3.851 allows a trial court to extend the evidentiary hearing for up to ninety days where good cause is shown. As with the prior requests, the trial court denied Doorbal a continuance.
*488 During a status conference held on January 21, 2005, counsel for Doorbal reported that "for the first time in . . . almost 10 years since he was charged we sent a team to Trinidad and we were able to secure those school records and that would have been helpful for people providing mental health mitigation." When asked by the trial court when the defense team went to Trinidad, counsel replied that they had left approximately ten days before and had returned the prior week. Counsel proceeded to again argue that a continuance was necessary because the experts had not yet reviewed all of the records. The trial court denied the request for a continuance, and it was then that counsel stated that she would not call any witnesses to testify at the evidentiary hearing.
Analysis
In light of the actions of counsel for Doorbal prior to the evidentiary hearing, we conclude that it was not an abuse of discretion for the trial court to deny the numerous continuances sought by Doorbal. A review of the record demonstrates that, despite the knowledge of counsel on November 9, 2004, that the evidentiary hearing was scheduled on February 14, 2005, counsel apparently did not take sufficient action to ensure that Doorbal would be fully prepared for that hearing. Instead, counsel seemed to assume that if she could delay the investigation of the mental health claim, the trial court would eventually capitulate and grant a continuance.
There are two specific areas where the conduct of counsel is especially of concern. First, as previously noted, the trial court during a November 16, 2004, hearing informed Doorbal that a hearing would be necessary with regard to whether to transport Doorbal to Miami-Dade County for evaluation. Counsel then proceeded to wait over one month, until December 24, 2004, to ask the trial court to order that Doorbal be transported. During this same hearing, counsel recognized that it could take the Florida Department of Corrections up to three weeks to transport Doorbal to Miami-Dade County. According to the record, Doorbal arrived in Miami-Dade County on approximately January 5, 2005. The mental health experts did not commence their evaluations of Doorbal until that time.
Even though counsel for Doorbal was on notice that the only claim to be considered at the evidentiary hearing was claim 8(f) (the mental health claim), she waited over a month to again address the issue of transport before the trial court. This date fell less than eight weeks before the evidentiary hearing was scheduled to occur, and counsel was aware that the transport of Doorbal could take up to three weeks. We conclude that postconviction counsel was in large part responsible for the time concerns to evaluate Doorbal, which, in turn, produced a continuance request for the experts to engage in further evaluations. The second noticeable delay with regard to the preparation of this case for an evidentiary hearing is that with respect to the investigation into the background of Doorbal. During the January 21, 2005, hearing, counsel for Doorbal admitted that she had not sent individuals to Trinidad to investigate his background until January 10, 2005, just over one month before the scheduled evidentiary hearing, despite the fact that she had been on notice since November 9, 2004, that the hearing was scheduled for February 14, 2005.
Counsel asserts that a continuance of this case was necessary due to the voluminous amount of records and documents in this case. While we agree that the record in this case is indeed significant even for a capital case, there is no direct correlation between the size of a file and the amount of time necessary to prepare for an evidentiary *489 hearing on postconviction motions. Moreover, a claim that trial counsel was ineffective for the failure to investigate and present mental health evidence is largely independent of the trial court record. Preparation of such a claim primarily entails an investigation of the background of the defendant and a comprehensive evaluation of that defendant by experts. Here, those timing factors were within the control of Doorbal's counsel.
The decision to wait until nearly two months after the Huff hearing to investigate the background or to involve mental health experts was the cause of the delays of counsel that required Doorbal to seek multiple continuances. Therefore, under the facts as presented by the instant case, we hold that it was not an abuse of discretion for the trial court to refuse to extend the date of the evidentiary hearing.

The Denial Order
Under this claim, Doorbal contends that the form of the order denying relief fails to provide this Court with guidance for appellate review because it does not reference hearings, transcripts, or any portion of the record. We disagree. We have held that to support a summary denial, the trial court must either state its rationale in the order or attach those portions of the record that refute the claims. See Nixon v. State, 932 So.2d 1009, 1018 (Fla.2006). Although the denial order in this case is extremely brief to summarily deny a large number of claims, it provides a specific basis why the trial court denied each claim without an evidentiary hearing. Further, with regard to the mental health claim, the order states that Doorbal withdrew his request for an evidentiary hearing on this claim and determines that Doorbal had failed to carry his burden to demonstrate entitlement to relief. Doorbal fails to present a single case in which this Court has granted relief under similar circumstances. Cf. Hoffman v. State, 571 So.2d 449, 450 (Fla.1990) (ordering evidentiary hearing on 3.850 motion where the trial court in its summary order stated no rationale for its rejection of the motion, failed to attach to the order portions of the record conclusively showing that relief was not required, and failed to find that the allegations were inadequate or procedurally barred). Therefore, we deny Doorbal relief on this claim.[12]

HABEAS PETITION

Ineffective Assistance of Appellate CounselStandard of Review
Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Consistent with the Strickland standard, to grant habeas relief based upon ineffectiveness of counsel, this Court must determine
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman, 761 So.2d at 1069. A defendant who raises a claim of ineffective assistance of counsel must allege a specific, serious omission or overt *490 act upon which the claim can be based. See Freeman, 761 So.2d at 1069. Claims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been presented on direct appeal or in a postconviction motion. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000). Moreover, if a legal issue would probably have been found to be without merit had counsel presented the issue on direct appeal, the failure of counsel to assert the meritless issue will not render the performance of appellate counsel ineffective. See id. It is under this standard that the remainder of the claims raised by Doorbal must be analyzed.

Denial of Motion to Continue Sentencing
In his first habeas claim, Doorbal alleges that his appellate counsel was ineffective because counsel failed to challenge on direct appeal the denial by the trial court of a motion to continue sentencing. Doorbal contends that when Schiller was taken into federal custody immediately after testifying during the Spencer hearing, the trial court erroneously denied a continuance that would have afforded Doorbal the opportunity to conduct discovery with regard to whether a Brady violation had occurred. We reject this claim. During his direct appeal, codefendant Daniel Lugo alleged that a Brady violation occurred due to the failure of the State to disclose its knowledge of the federal investigation of Marc Schiller for Medicare fraud. See Lugo, 845 So.2d at 104. The trial court denied a request by Lugo for either a new trial or a new round of discovery. See id. On direct appeal, we rejected Lugo's allegations of a Brady violation. See id. at 105.
Appellate counsel cannot be ineffective for failing to raise a meritless issue on appeal. See Lawrence v. State, 831 So.2d 121, 135 (Fla.2002); see also Kokal v. Dugger, 718 So.2d 138, 142 (Fla.1998) ("Appellate counsel cannot be faulted for failing to raise a nonmeritorious claim."). Since the claim that the defendants should have been allowed to conduct further discovery with regard to the alleged failure of the State to disclose the federal investigation against Schiller was previously considered and rejected by this Court in the direct appeal of Lugo, counsel for Doorbal was not ineffective for failing to raise this claim on direct appeal. Accordingly, we deny this claim.

Motion to Continue Trial
Doorbal next contends that his counsel was ineffective because counsel failed to allege on direct appeal that the trial court erroneously denied defense motions for continuance after the father of trial counsel Anthony Natale died and his mother was in the hospital. According to Doorbal, the trial court denied Natale a thirty-day continuance after his father died and only allowed him two weeks to attend to family business. Doorbal contends that, as a result, Natale was faced with a conflict of interest that adversely affected his representation of Doorbal at trial.
As we previously noted, a trial court's ruling on a motion for continuance is reviewed under the abuse of discretion standard. See Hernandez-Alberto, 889 So.2d at 730. The emergency motion for continuance filed by counsel Natale indicates that he was experiencing a family crisis in the months prior to Doorbal's trial. However, the record of the trial court proceedings contains neither an order ruling on the motion for continuance nor the transcript of a hearing on the motion for continuance. Nonetheless, as noted by the State in its brief, the twenty-five-day delay period between the date that counsel Natale filed the motion and the commencement of jury selection indicates that the trial court indeed effectively granted the *491 request for continuance as a practical matter.
However, even if the trial court denied the motion, we conclude that the denial did not amount to an abuse of discretion. In Randolph v. State, this Court affirmed the denial of a motion for continuance where the defendant was represented by counsel at all stages of the evidentiary proceedings and where the defendant failed to allege how the ruling of the trial court resulted in undue prejudice. See 853 So.2d at 1062. This Court in Randolph also noted that the trial court had already granted the defendant a number of continuances. See id. at 1062-63 n. 11.
In the instant case, during the periods of time when attorney Natale was absent, Doorbal remained represented by cocounsel Penny Burke. Further, Doorbal has failed to describe what prejudice he suffered by the failure of the trial court to grant a continuance  he only generally states that the record is "rife" with examples of prejudice. However, generalized references to prejudice without any specific allegations of deficiencies are insufficient to provide a basis for a claim of ineffective assistance of trial counsel. Finally, during a hearing held on January 9, 1998, the trial court noted that it had already continued the trial three times at the request of the defense and continued the hearing on the motion to suppress twice.
We conclude that Doorbal has failed to demonstrate that he suffered any prejudice by the failure of the trial court to grant a thirty-day continuance, if indeed the request was denied, especially in light of the fact that Doorbal was represented by cocounsel Burke during this time. We conclude that had appellate counsel alleged on direct appeal that the trial court abused its discretion when it refused to grant Doorbal a continuance, this claim would have been rejected. Therefore, we conclude that counsel was not ineffective for failing to raise this claim on appeal. See Cooper v. State, 856 So.2d 969, 978 (Fla. 2003) (rejecting claim that appellate counsel was ineffective for failing to appeal trial court denial of a motion for continuance and concluding that claim "would have been deemed meritless on appeal").

Motion to Withdraw  Counsel Natale
Doorbal contends that appellate counsel was ineffective because counsel failed to challenge the denial of "numerous" motions to withdraw filed by counsel Natale in light of the personal difficulties he experienced during his representation of Doorbal. However, Doorbal fails to provide any record reference with regard to counsel Natale allegedly requesting permission to withdraw. A review of the record of the trial court proceedings does not indicate that counsel Natale filed "numerous" motions to withdraw. Instead, the record reveals that Natale moved to withdraw early in the proceedings. Natale had initially been retained as private counsel to defend Doorbal in the Schiller counts, and Natale was paid a specified fee. After the Griga/Furton counts were added, and Doorbal's case became a first-degree double murder case, Natale asked to withdraw based on the fact that he "wasn't contracted to handle this matter" based on the fee that he had been paid. Further, the trial court initially concluded that Doorbal was not indigent and would have to retain his own attorney. During a subsequent hearing, however, the State stipulated that Doorbal was indigent, and the trial court appointed counsel Natale to represent him. When the prosecutor mentioned that Natale had a pending motion to withdraw, Natale replied, "Everything's withdrawn."
Appellate counsel cannot be ineffective for failing to raise an abandoned motion on appeal. See Teffeteller v. Dugger, 734 So.2d 1009, 1028 (Fla.1999). *492 Counsel Natale abandoned his request to withdraw from his representation of Doorbal, and, therefore, we conclude that appellate counsel was not ineffective when this claim was not raised during the direct appeal.

Motion to Sever
Doorbal asserts that his appellate counsel was ineffective because counsel failed to challenge the denial of a motion to sever his trial from that of his codefendents. According to Doorbal, he was a relatively peripheral character in the crimes. Doorbal contends that he was merely a follower and a servant, while individuals such as Lugo made decisions and acted in leadership roles. Doorbal claims that to try him in the same proceedings as Lugo reinforced to the jurors that the conduct of Doorbal was on the same level as that of Lugo.
We conclude that this issue is without merit. For an issue to be preserved for appeal, it must be presented to the lower court, and the specific legal argument or ground to be argued on appeal must be part of that presentation. See Perez v. State, 919 So.2d 347, 359 (Fla. 2005). Appellate counsel cannot be ineffective for the failure to assert an argument that would have been procedurally barred because it was not presented during trial. See Rutherford, 774 So.2d at 648. The record reveals that Doorbal never asserted his peripheral role in the killings as a basis for severance. Therefore, had appellate counsel raised this challenge on direct appeal, it would have been procedurally barred. See id. Thus, the failure of appellate counsel to raise this issue on appeal does not constitute ineffectiveness.
Moreover, even if this issue had been preserved, this claim fails. Doorbal was convicted of RICO violations and conspiracy to commit RICO violations. Under the Florida Statutes, the elements of a RICO crime are (1) conduct or participation in an enterprise; through (2) a pattern of racketeering activity. See Lugo, 845 So.2d at 97; see also § 895.03, Fla. Stat. (2006). To prove the element of "enterprise," the State must prove "(1) an ongoing organization, formal or informal, with a common purpose of engaging in a course of conduct, which (2) functions as a continuing unit." Lugo, 845 So.2d at 97; see also § 895.02(3), Fla. Stat. (2006). To satisfy the "enterprise" element of the RICO statute, the State must demonstrate that a defendant acted in concert with at least one other person, organization, or entity. See State v. Jackson, 677 So.2d 938, 941 (Fla. 2d DCA 1996). Therefore, under the RICO statute, Doorbal's involvement with Lugo and Mese was an element of the crime that the State was required to prove. Evidence of the conduct and actions of Mese and Lugo would have been admissible in any trial for Doorbal even if the defendants had received separate trials. Further, the extent to which Doorbal participated in the RICO conspiracy would not have been a basis upon which to grant severance because to constitute a RICO coconspirator, the individual must
intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.
Mese v. State, 824 So.2d 908, 913 (Fla. 3d DCA 2002) (quoting Salinas v. United States, 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)). Moreover, the United States Supreme Court has held that *493 "[i]f conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." Salinas, 522 U.S. at 64, 118 S.Ct. 469. Even if Doorbal did not assume a leadership role in the conspiracy, this would not have compelled severance of the trials of the codefendants because Doorbal still participated in the overall conspiracy. See Lugo, 845 So.2d at 99 (noting that "Doorbal was literally [Lugo's] partner in crime, making for an unchanging pattern of roles which was utilized to execute the predicate acts of racketeering."). Accordingly, even if appellate counsel had presented this issue on appeal, Doorbal could not have established that the trial court abused its discretion. See Crum v. State, 398 So.2d 810, 811 (Fla.1981) (standard of review for denial of a motion for severance is abuse of discretion).[13] Therefore, failure to assert this claim on appeal does not constitute ineffectiveness.

Motion to Sever Counts of the Indictment
Doorbal next contends that his appellate counsel was ineffective because counsel failed to challenge the denial of a motion to sever the counts of the indictment. During trial, Doorbal asserted that the law required the RICO offenses to be severed. According to Doorbal, joinder of the offenses would be proper only if they were connected in a significant way. Under the current claim, Doorbal contends that there is no similarity between the Griga/Furton and Schiller counts. Doorbal claims that had the counts been severed, there is a reasonable probability that he would have been acquitted of either the murder counts or the Schiller counts, the latter of which were found by the trial court to be aggravating factors in the imposition of the death penalty.
This claim is without merit. During the direct appeal of codefendant Daniel Lugo, Lugo asserted that the trial court erred when it denied the severance of the Schiller, Griga/Furton, and RICO counts. See Lugo, 845 So.2d at 92. Lugo contended before the trial court "that a single trial on all the counts would result in spillover prejudice to the extent that jurors would not be able to make individual determinations of guilt or innocence regarding each criminal charge." Id. On direct appeal, this Court denied relief on this claim in a thorough analysis:
On the facts before us, we are not prepared to determine that the trial judge erred in his conclusion that the RICO charges provided a "relevant relationship" between the Schiller and Griga-Furton counts, thereby justifying a single trial on all charges filed against Lugo. This conclusion reflects the requirement that there be a "meaningful relationship" among charges that are tried together. . . . [T]he instant case involves charges of racketeering that link criminal incidents which might appear upon initial inspection to be temporally unrelated because they occurred within a six-month span. The racketeering charges provide the "significant way" in which the Schiller counts, the Griga-Furton counts, and Lugo's alleged racketeering activity were linked.
. . . .
We also disagree with Lugo's contention that the racketeering activities were not related in an episodic sense. The unfortunate racketeering activity in which Lugo and others participated began *494 with the abduction, extortion, and attempted murder of Marc Schiller, continued with the incident involving the planned abduction and extortion of Winston Lee, and reached its tragic pinnacle in the events related to the abduction and terror-filled murders of Frank Griga and Krisztina Furton. The careful planning that surrounded each of these incidents, along with the manner of execution, obviates the conclusion that they were entirely random, disconnected events.
With regard to the abduction and subsequent crimes against Schiller, as well as the abduction and subsequent crimes against Griga and Furton, the record indicates that at least one plot was aborted before an actual abduction took place. Each plot involved intricate planning and the assignment of specific duties to each participant, including Lugo. . . . Lugo and Doorbal also visited Griga's Golden Beach home before the abduction of Griga and Furton occurred. During the last visit before the abduction occurred, Lugo and Doorbal each had a concealed firearm. Testimony from Sabina Petrescu, Lugo's girlfriend, indicated that Doorbal was very upset when Lugo did not follow through on the plan to kidnap Griga and Furton during this particular visit, but was later placated by Lugo with the knowledge that they would execute the abduction later that evening. While Griga and Furton were held hostage, both were subdued with Rompun, which Lugo and Doorbal had procured for that specific purpose. Furton was also subdued with handcuffs and tape, as was Schiller. Furthermore, it is important to note that in the intervening months between the Schiller and Griga-Furton abductions, Lugo directed the surveillance of Winston Lee's townhome, with the goal of abducting Lee and obtaining his assets. This type of activity over a six-month period does not have the characteristics of impulsive, sporadic behavior. The nature of these crimes removes them from the category of being merely similar to each other, and requires that they be placed in the category of "connected acts or transactions." Fla. R.Crim. P. 3.150(a).
We further note that if separate trials on the Schiller and Griga-Furton counts had been held, evidence of the abduction, extortion, and attempted murder of Schiller would have been admissible in Lugo's trial for the abduction, attempted extortion, and murders of Griga and Furton, and vice versa. This evidence would have been admissible in separate trials to establish the existence of an ongoing, common scheme to target wealthy victims, as well as to establish the entire context within which Lugo's criminal activity occurred. Therefore, due to the common scheme that is related to both the Schiller and Griga-Furton counts, Lugo "has failed to demonstrate that a severance was necessary for a fair determination of his guilt or innocence."
Id. at 94-96 (citations and footnotes omitted) (quoting Bundy v. State, 455 So.2d 330, 345 (Fla.1984)).
Appellate counsel cannot be ineffective for the failure to raise a meritless issue on appeal, see Lawrence, 831 So.2d at 135, and the claim raised by Doorbal was previously considered and rejected by this Court in the direct appeal of codefendant Lugo. See Lugo, 845 So.2d at 93-97. Moreover, even though Doorbal contends that he was merely a follower in these crimes, we rejected the claim that the trial court erred in failing to find as a nonstatutory mitigator that Doorbal was acting under extreme duress or was under the substantial domination of another. *495 See Doorbal, 837 So.2d at 960 n. 47.[14] Therefore, counsel was not ineffective for failing to raise this claim on appeal.

Motion for New Trial
Doorbal contends that appellate counsel was ineffective because counsel failed to challenge on direct appeal the denial of a motion for new trial. Under this claim, Doorbal asserts that the trial court erroneously held that Doorbal was not entitled to a new trial after it was discovered that Schiller was involved with and would be indicted for Medicare fraud. We conclude that this claim lacks merit. During the direct appeal of codefendant Lugo, we concluded that the trial court did not err when it denied a motion for new trial filed by Lugo on the basis that a Brady violation had occurred. See Lugo, 845 So.2d 74. Since this claim was previously considered and rejected by this Court in the direct appeal of codefendant Lugo, appellate counsel for Doorbal was not ineffective for failing to raise the same nonmeritorious claim on appeal. See Lawrence, 831 So.2d at 135. Therefore, we deny this claim.

Motion to Declare Death Penalty Unconstitutional
Although appellate counsel did argue on appeal that the trial court erroneously found both the aggravating circumstances of pecuniary gain and murder committed in the course of a felony, and asserted that improper doubling occurred, Doorbal contends in this claim that appellate counsel failed to fully and properly challenge the constitutionality of these two aggravators. Doorbal further asserts that in this case, the pecuniary gain circumstance applied with the robbery circumstance was improper.
This claim is without merit. The trial court did not find the "during the commission of a felony" aggravator based on robbery, but on kidnapping. See Doorbal, 837 So.2d at 951. Hence, Doorbal's contention that the trial court improperly doubled the pecuniary gain and during the course of a felony (robbery) aggravators is inaccurate. In addition, appellate counsel did challenge the finding of the pecuniary gain and during the course of a felony (kidnapping) aggravators, and we denied relief on this claim. See id. at 960. Finally, this Court has rejected assertions that murder in the course of a felony is an unconstitutional automatic aggravator, that the pecuniary gain aggravator is improperly and overbroadly employed, that the pecuniary gain jury instructions are unconstitutionally vague, and that the pecuniary gain and during the course of a felony aggravators fail to narrow the class of persons eligible for the death penalty. See Jones v. State, 928 So.2d 1178, 1183 n. 6 (Fla.2006); Griffin v. State, 866 So.2d 1, 14 (Fla.2003); Card v. State, 803 So.2d 613, 628 (Fla. 2001); Kelley v. Dugger, 597 So.2d 262, 265 (Fla. 1992).
The challenges now raised by Doorbal are either grounded in incorrect assumptions or have previously been rejected by this Court, and appellate counsel was not ineffective for the failure to raise these meritless challenges. See Lawrence, 831 So.2d at 135.

Motion to Withdraw  Counsel Burke
Doorbal next asserts that appellate counsel was ineffective because counsel failed to allege on direct appeal that the trial court erred when it denied the motion to withdraw filed by cocounsel Burke. In the motion to withdraw, Burke revealed that her secretary and Doorbal had entered into a romantic relationship, which caused multiple problems with the attorney-client *496 relationship between Burke and Doorbal. However, Burke subsequently abandoned the motion. During a hearing held on November 24, 1997, Burke stated on the record:
Mr. Doorbal and myself and Mr. Natale have been able to resolve any issues that might be potentially conflicting. I would be filing something that we would like Mr. Doorbal to sign to the Court as well as Mr. Natale. We have been unable to prepare it based on [Natales family troubles]. At this point I will remain as second chair in the case. Is that correct Mr. Doorbal?
Doorbal verified that this statement was correct. See id. Appellate counsel cannot be ineffective for the failure to raise an abandoned motion on appeal. See Teffeteller, 734 So.2d at 1028. Therefore, we deny this claim.[15]

Denial of Funds for Defense Experts
Doorbal next asserts that appellate counsel was ineffective because counsel failed to challenge on direct appeal the failure of the trial court to authorize large sums of money to pay a psychiatric expert that was allegedly necessary for the defense of Doorbal. The refusal to approve funds for the payment of experts for an indigent defendant is reviewed under an abuse of discretion standard. See San Martin v. State, 705 So.2d 1337, 1347 (Fla. 1997). This Court has applied a two-part test to evaluate whether a trial court has abused its discretion: (1) whether the defendant established a particularized showing of need; and (2) whether the defendant was prejudiced by the denial of the motion. See id.
We reject this claim as meritless because Doorbal cannot demonstrate that he was prejudiced by the denial of additional funds for the expert. The record in this case reveals that after Doorbal was sentenced to death, trial counsel submitted a final invoice to the trial court stating that, thus far, it had authorized the payment of $4000 to the expert, but an additional $2,450.46 was needed to pay the expert in full. On October 29, 1998, the trial court held a hearing on this motion and explained to counsel that all expert funds must be authorized in advance:
COURT: Did I ever approve $2,450.46?
COUNSEL: You have not approved that yet, and that is my motion to have you approve that.
COURT: Okay. And my problem with that is that you guys have to seek that in advance. You can't, like, let your expert do whatever he wants, and then, submit a bill, and by the way, he has to be paid this money, too.
The trial court ultimately ordered that the expert be paid the $4000 that the trial court previously authorized, but denied the request for the $2,450.46 that was not approved in advance.
The record indicates that the expert did not restrict his mental health evaluation based upon a denial of additional expert funds. Instead, it appears that the expert proceeded to incur fees to complete his evaluation without obtaining prior authorization from the Court, and then sought *497 payment for his bill in excess of $4000 after Doorbal was sentenced. Doorbal fails to assert and cannot establish that the expert did not perform critical evaluations or investigation due to the denial of additional funds by the trial court.[16] Therefore, there was no prejudice from the denial of the $2,450.46 in additional fees when that denial occurred after the expert had already completed the mental health evaluation (and incurred the fees) and had ceased working with Doorbal.
The trial court did not abuse its discretion when it denied the payment of additional fees to the expert.[17] Since this issue is without merit, appellate counsel was not ineffective for failing to raise it on direct appeal. See Lawrence, 831 So.2d at 135.

Admission of Photographs
In his next claim, Doorbal asserts that appellate counsel was ineffective based on an alleged failure to challenge the introduction of gruesome photos of the bodies of Griga and Furton. The photographs that the trial court admitted over objection were exhibits 1161 (the severed right ankle of Griga), 1162 (the severed left ankle of Griga), 1185 (the torso of Furton), 1186 (a close-up of Furton's torso) and 1172 (the removal of Furton's torso from a barrel).
The standard of review for the admission of photographs is abuse of discretion. See Davis v. State, 859 So.2d 465, 477 (Fla.2003). This Court has explained:
"The test for admissibility of photographic evidence is relevancy rather than necessity." Crime scene photographs are considered relevant when they establish the manner in which the murder was committed, show the position and location of the victim when he or she is found by police, or assist crime scene technicians in explaining the condition of the crime scene when police arrived. This Court has upheld the admission of autopsy photographs when they are necessary to explain a medical examiner's testimony, the manner of death, or the location of the wounds.
However, even where photographs are relevant, the trial court must still determine whether the "gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jur[ors] and [distract] them from a fair and unimpassioned consideration of the evidence." In making this determination, the trial court should "scrutinize such evidence carefully for prejudicial effect, particularly when less graphic photos are available to illustrate the same point."
Douglas v. State, 878 So.2d 1246, 1255 (Fla.2004) (citations omitted) (alterations in original) (quoting Pope v. State, 679 So.2d 710, 713 (Fla.1996); Czubak v. State, 570 So.2d 925, 928 (Fla.1990); Marshall v. State, 604 So.2d 799, 804 (Fla.1992)). The admission of photographs will also be upheld if they are corroborative of other evidence. See Czubak v. State, 570 So.2d at 928. The admission of the photographs of a deceased victim must be probative of a disputed issue, see Almeida v. State, 748 *498 So.2d 922, 929 (Fla.1999), but we have advised "[t]hose whose work products are murdered human beings should expect to be confronted by photographs of their accomplishments." Chavez v. State, 832 So.2d 730, 763 (Fla.2002) (quoting Henderson v. State, 463 So.2d 196, 200 (Fla.1985)).
The trial court here was very candid with regard to the photos in this case, and recognized that "[a]ll of the evidence in this case is somewhat prejudicial." The trial court was especially careful with regard to the admission of photos, and he expressly instructed the expert that he did not want the jury to see photos that were more inflammatory than necessary. In balancing the evidence, the judge indicated that he did not want to inappropriately limit the experts to exhibits that would make their testimony less credible because a necessary photo had been excluded. There is no question that the photos admitted in evidence in this case are disturbing. However, the underlying facts were egregious and produced severed body parts, a headless, handless torso, and the removal of a headless, handless, footless body from a barrel. For purposes of our analysis, we address the photos grouped by the asserted basis for their admission.
Exhibits 1161 and 1162  These photos depict the severed right and left ankle of Griga. Doorbal objected to these photos and argued that they were unduly prejudicial. These photos were introduced to assist Dr. Falsetti, a physical anthropologist, in explaining to the jurors why he had concluded that Griga's feet were severed with a chainsaw. These photos and the testimony of Dr. Falsetti were corroborative to the testimony of Jorge Delgado, who testified that Doorbal dismembered the bodies of Griga and Furton with a chainsaw. We conclude these photographs were relevant to the trial. Further, the record reflects that the trial court minimized the number of photographs of severed body parts to be introduced into evidence. When Dr. Falsetti testified that he could explain his testimony with the use of a photograph of the bone, or a less graphic photo of the injury, the trial court excluded the more graphic photo. The trial court allowed into evidence these two photos only because photographs of these bones were not available. The trial court imposed a careful process to question the witness to only admit photos which were absolutely necessary to the testimony of Dr. Falsetti. We conclude that the trial court did not abuse its discretion when it admitted these two photographs.
Exhibit 1186  This photo depicts the torso of Furton, and the trial court did not abuse its discretion when it was admitted into evidence. Dr. Middleman, a medical examiner, testified that because the head, hands, and feet of the victim had been removed, he was looking for anything that could serve for a point of identity. Exhibit 1186 depicts a scar on Furton's torso that was the result of breast implants. The State indicated that only one doctor in Florida performed breast implant surgery in a manner that would generate the scar that was depicted in the photo of Furton's torso. This Court has held that photographs are admissible when they are relevant to prove identity. See Jackson v. State, 545 So.2d 260, 265 (Fla. 1989). The trial court admitted only one of the photos to which Doorbal objected to demonstrate the scar that led to the identification of Furton, and the trial court did not abuse its discretion in admitting this photo.
Exhibits 1185 and 1172  These photos depict Furton's torso and individuals removing the body of Furton from a barrel. It should be noted that when Doorbal objected to exhibit 1172, the objection *499 was that this photo and another which was ultimately excluded were duplicative. For an issue to be preserved for appeal, it must have been presented to the lower court, and the specific legal argument and factual basis to be argued on appeal must have been part of that presentation. See Perez, 919 So.2d at 359. Doorbal did not challenge exhibit 1172 on the basis that it was gruesome. The current claim was not preserved for appeal, and, therefore, appellate counsel was not ineffective for failing to present that position. See Rutherford, 774 So.2d at 637 (appellate counsel not ineffective for failing to raise an argument that would have been procedurally barred because it was not presented during trial).
On the merits, Dr. Middleman needed to utilize exhibit 1172 because it provided one of the better views of the entire body of Furton. Further, Dr. Middleman utilized both exhibits 1172 and 1185 to demonstrate how quickly the body decomposed from the time it was removed from the barrel until the next day when the photos were taken at the medical examiners' office. We conclude that exhibit 1172 was relevant to show the position and location of the victim when she was found by police, see Douglas, 878 So.2d at 1255, even though the photo was introduced during the testimony of the medical examiner. On the other hand, exhibit 1185 was not introduced for the purpose of identifying Furton,[18] nor was it admitted into evidence to show manner of death. Rather, it was placed in evidence to demonstrate how quickly the body of Furton had decomposed overnight. The relevance or probative value of the rate of decomposition under these particular facts and issues for jury consideration have not been demonstrated. Therefore, we conclude that the trial court abused its discretion in admitting exhibit 1185, a photo of a decapitated torso in a state of decomposition.
Nonetheless, even if the admission of this photograph into evidence was error, appellate counsel was not ineffective for the failure to raise this challenge on direct appeal. In Looney v. State, 803 So.2d 656 (Fla.2001), this Court held that the trial court erred when it admitted autopsy photos of victims who had been set on fire after they had been murdered, but concluded that the error was harmless:
Because the victims' bodies were so damaged by the fire, neither of the admitted autopsy photos (each depicting close-ups of the charred remains of the victims) are probative of the medical examiner's determination as to the manner of the victims' deaths. The photographs at issue were only used by the medical examiner to describe the damage done to the victims' bodies by the ensuing fire. Said another way, the damage caused to the deceased victims' bodies by the fire after their deaths was not an issue in dispute. Moreover, the medical examiner's testimony about the cause of death did not rely at all on the photographs.
Because the photographs were not relevant, that is, not probative of any fact in issue, we find it was error to admit the autopsy photographs. See Almeida, 748 So.2d at 930. However, given Dempsey's direct evidence implicating Looney, the physical and testimonial evidence corroborating Dempsey's account of the events, and the minor role the autopsy photos played in the State's case, we find any error harmless.
*500 Id. at 670 (footnotes omitted). In the instant case, Jorge Delgado testified that Doorbal had carved up the bodies of Furton and Griga with a chainsaw. This fact was corroborated by the fact that the bodies of Furton and Griga were dismembered in a manner that attempted to prevent identification of the torsos. Further, one other photo of the dismembered body of Furton was introduced into evidence  exhibit 1172  so exclusion of exhibit 1185 would not have prevented the jury from seeing this image. Finally, exhibit 1185 was a single photo introduced in a trial that covered approximately four months. Based on the foregoing, we conclude that had appellate counsel challenged the introduction of this photo on direct appeal, it would have been found to be harmless error. Therefore, counsel was not ineffective for failing to raise this challenge on direct appeal. See Kokal, 718 So.2d at 142.
Doorbal is not entitled to relief on this claim because the challenges to the photographs were either not preserved, or, if preserved, would not have been successful on appeal.

Motion to Suppress
In his last claim, Doorbal asserts that his appellate counsel was ineffective because counsel failed to challenge the denial of a motion to suppress statements which Doorbal made while being questioned by detectives. This claim is without merit because the State ultimately did not introduce the statements into evidence. In Griffin v. State, 639 So.2d 966, 972 n. 4 (Fla. 1994), the defendant alleged on direct appeal that the trial court erred when it denied a motion to suppress certain statements by the defendant. This Court concluded that the claim was without merit because the State did not present the statements to the jury. See id. The statements Doorbal sought to suppress were never introduced as evidence and were never heard by the jury. Doorbal could not have been prejudiced in any way. Therefore, had counsel attempted to raise this claim on direct appeal, it would have been deemed meritless. See id. Accordingly, we deny this claim of ineffectiveness.

CONCLUSION
For the foregoing reasons, we affirm the denial of the rule 3.851 motion and deny the petition for writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, J., specially concurs with an opinion, in which ANSTEAD, J., concurs.
PARIENTE, J., specially concurring.
I agree with the majority's decision to affirm the denial of Doorbal's motion for postconviction relief and deny his habeas petition. I write separately to voice my concerns about the judge's action in testifying in an unrelated proceeding on behalf of the victim who was a key witness against Doorbal in his murder case. I also write to indicate my strong agreement with the majority's caution that "we do not encourage trial judges to testify on behalf of a victim from one of their prior criminal cases with regard to the ordeal of the victim in that prior case." Majority op. at 478. In fact, I would actually go further and hold that judges should not voluntarily testify in such circumstances, especially since such conduct may violate the Florida Code of Judicial Conduct, which prohibits a judge from voluntarily testifying as a character witness.
The majority concludes that Doorbal failed to establish a well-grounded fear that he would not receive a fair hearing, *501 citing to Waterhouse v. State, 792 So.2d 1176 (Fla.2001). Although I agree with the ultimate conclusion and concur in the denial of relief on this claim, I believe that Waterhouse is distinguishable. In Waterhouse, "in accordance with well-settled procedures, the [Parole] Commission sought comments from the sentencing judge" as part of the official postconviction clemency investigation process. Id. at 1194. The judge's comments were given in the official postsentence investigative process  comments that were specifically requested by the Commission "in accordance with well-settled procedures" and did not indicate a predisposed bias against the defendant. See id. at 1194-95.
On the other hand, the judge in this case testified in an unrelated federal prosecution on behalf of a key witness in Doorbal's murder trial. Additionally, there is no evidence in the record that Judge Ferrer was subpoenaed or otherwise forced to testify on behalf of Schiller. In fact, a review of his testimony appears to indicate that he felt obliged to testify because he believed Schiller deserved some leniency based on his horrific experience. To me, there is an important distinction between a trial judge who is requested by the Parole Commission under standard procedure to testify about the circumstances of a defendant's crime and a trial judge who chooses to testify, unofficially and apparently upon his or her own volition, on behalf of an individual who was a key witness in a trial over which the judge presided or one in which the judge will preside in the future. Because of these differences, I do not agree that Waterhouse is dispositive.
Despite my concern over the use of Waterhouse in this case, I agree with the majority that Doorbal's motion to disqualify failed to sufficiently allege a "well grounded fear that he will not receive a fair trial at the hands of the judge." Livingston v. State, 441 So.2d 1083, 1087 (Fla. 1983) (quoting State ex rel. Brown v. Dewell, 131 Fla. 566, 179 So. 695, 697 (1938)). Judge Ferrer's testimony primarily mirrors his findings of fact as to the prior violent felony aggravator in Doorbal's original sentencing order, which was in part based upon Doorbal's invmlvement in the gruesome events of Schiller's abduction. Moreover, the judge neither mentioned Doorbal by name nor discussed his feelings about the perpetrators of the offense or the sentences imposed. For these reasons, I concur in the denial of relief on this claim because Doorbal failed to allege a well-grounded fear that he would receive an unfair trial.
The majority also alludes to a parallel responsibility affecting the issue of disqualification  a judge's obligations under the Code of Judicial Conduct. The majority is correct in noting the "fine line" that a judge may be forced to walk by testifying as a witness on behalf of a victim in a case such as this. Indeed, Canon 2 of the Code of Judicial Conduct requires a judge to "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," and specifically prohibits a judge from testifying "voluntarily as a character witness." Fla.Code of Jud. Conduct, Canon 2 A-B. Accordingly, I believe that Judge Ferrer's voluntary testimony on behalf of Schiller came dangerously close to violating Canon 2 B of the Code of Judicial Conduct. Thus, absent a subpoena, this testimony would have been in violation of the Judicial Code of Conduct. For these reasons, I agree with the majority's caution to judges against testifying in such circumstances.
ANSTEAD, J., concurs.
NOTES
[1] Lugo and Doorbal met with Griga to discuss the possibility of investment in phone lines in India. See id. The investment scheme was bogus, but was designed as a means for Lugo and Doorbal "to ingratiate themselves with Griga and to gain his confidence." Id.
[2] The claims are as follows: (1) Florida Rule of Criminal Procedure 3.851 is unconstitutional on its face and as applied to Doorbal; (2) Section 119.19 of the Florida Statutes and Florida Rule of Criminal Procedure 3.852 are facially unconstitutional and as applied to Doorbal; (3) State agencies improperly withheld files and records that pertained to Doorbal's case in violation of chapter 119 of the Florida Statutes; (4) the State improperly withheld impeachment evidence because it failed to disclose that Marc Schiller was under federal investigation for Medicare fraud, and presented false or misleading evidence during the trial when it allowed Schiller to falsely testify that he was not involved in Medicare fraud; (5) the trial of Doorbal was fraught with procedural and substantive errors that could not be considered harmless when viewed as a whole; (6) the trial court violated the constitutional rights of Doorbal when it denied various motions, which included a motion for a new trial; (7) Rule Regulating the Florida Bar 4-3.5(d)(4) is unconstitutional because it prohibits interviews of jurors by counsel to determine if constitutional error was present; (8) trial counsel was ineffective for (a) failing to withdraw prior to trial when he experienced severe financial hardship and personal crises which rendered him incapable of focusing on his duty to represent Doorbal; (b) the failure to object to the introduction of "bad character" evidence and prosecutorial misconduct during closing argument; (c) the failure to investigate Doorbal's claim of innocence pertaining to the Schiller counts, the failure to develop defenses to these counts, and the failure to retain experts to testify in support of the claim of innocence; (d) the failure to investigate Doorbal's claim of innocence pertaining to the Griga/Furton counts, the failure to develop defenses to the first-degree murder charges, and the failure to retain experts to testify in support of the claim of innocence; (e) the failure to properly proffer letters written by codefendant Lugo to Doorbal; (f) the failure to obtain an adequate mental health evaluation and the failure to provide necessary background information to the mental health consultant; (g) the failure to adequately prepare and investigate mitigating evidence; (h) the failure to secure consular access to Doorbal, who is a citizen of Trinidad, and the failure to object to the denial of consular access to Doorbal by the State; (i) the failure to successfully move for severance of claims, severance of defendants, and bifurcation of juries; and (j) the failure to request that the jury be instructed that mercy and sympathy are proper considerations in the penalty phase and the failure to object to improper argument by the State that Doorbal should receive no mercy; (9) Florida's sentencing scheme is unconstitutional because it fails to prevent arbitrary and capricious imposition of the death penalty; (10) the convictions and sentences are unconstitutional under Ring; (11) the death sentences are unconstitutional because the penalty phase jury instructions improperly shifted the burden to Doorbal to demonstrate that death was inappropriate, and counsel was ineffective for the failure to object to these instructions; and (12) execution by electrocution or lethal injection constitutes cruel and unusual punishment.
[3] Huff v. State, 622 So.2d 982 (Fla. 1993).
[4] On January 18, 2005, Doorbal filed an amended rule 3.851 motion in which he realleged all of the claims that he raised in his initial motion. The trial court permitted amendment of claim 8(f) (the mental health evaluation claim), but denied amendment of the other claims.
[5] This rule was renumbered in 2006. See In re Amendments to Fla. Rules of Jud. Admin.  Reorganization of the Rules, 939 So.2d 966 (Fla.2006).
[6] This email states, in pertinent part:

Alicia Valle AUSA called and told me the[y] got the flip in N.J. They do NOT need Delgado to make the case. BUT, Jack Denaro came to her office and asked her for a plea and she is thinking about making it CONCURRENT. Just what I don't want. Last week when I spoke with Ms. Rundle about the Natale matter, she told me to make sure that the Feds did not mess me up. That they can just wait because our case is so much more important. . . . I thought that if we gave the Feds more info so they didn't need Delgado that they would give him consecutive time. I really think that we need to stand firm on this even if you or Ms. Rundle have to call the powers that be over there. They just seem like they will plead anyone outBut Schiller. That's the only person they care about even though Delgado is in this for over a million. By the way the deal will also save his entire family. He is looking worse and worse for me. . . . I rather he be pending charges when I try the case than this cush deal.
[7] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[8] Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[9] Spencer v. State, 615 So.2d 688 (Fla.1993).
[10] Doorbal seems to assert that if Schiller had been forced to admit Medicare guilt, the jurors would have been more likely to believe that he had fabricated his testimony of his kidnapping, extortion, and attempted murder. Doorbal also appears to assert that if Schiller was revealed to be a criminal himself, the jurors would have been less likely to recommend the death penalty for the Griga/Furton counts. Doorbal implies that if an individual engages in illegal practices, the abduction, torture, and attempted murder of that individual is not as egregious as if the victim is a law-abiding citizen. This Court disagrees with both assertions.
[11] The court was closed on Monday, January 17, 2005, for the Martin Luther King, Jr., holiday.
[12] Moreover, we have already held that Doorbal waived his challenge to the summary denial of all of his claims but the mental health claim. Since this challenge was waived, the adequacy of the summary denial order is arguably moot.
[13] This Court and the Third District affirmed the denial of the motions for severance filed by codefendants Lugo and Mese. See Lugo, 845 So.2d at 97 n. 41; Mese, 824 So.2d at 915.
[14] The sentencing order of the trial court reflects that Doorbal had stated, "If Lugo will keep his mouth shut, we'll be in the clear." Id. at 959.
[15] Moreover, even if counsel Burke had not abandoned this motion, it is unlikely that it would have been an abuse of discretion for the trial court to deny the motion to withdraw based upon the decision of Doorbal to commence a romantic relationship with the secretary. We have held that "when conflict between a defendant and the defendant's counsel is attributable solely to the defendant's own contumacious behavior and not to any competing interest of counsel, a defendant has not been denied the right to counsel due to such conflict of interest." Wike v. State, 698 So.2d 817, 820 (Fla.1997).
[16] Moreover, Doorbal fails to allege in the habeas petition what evaluations the expert failed to perform due to the denial of funds, or how Doorbal was prejudiced by the expert's alleged failure to perform these evaluations. Doorbal's only assertion in this claim is that "[a]n uncompensated expert labors under something of a financial conflict likely to sour the defense's relationship with its expert." We question whether this claim is even sufficiently pled.
[17] There is a possibility that the expert was actually paid the additional $2,450.46 in fees. Despite the trial judge's announcement that he would not approve the fees, the record contains a signed order authorizing the payment of the additional fees to the expert.
[18] In fact, the trial court started to exclude this photo as duplicative, but the State announced that they were not seeking to introduce it to prove Furton's identity, but to demonstrate the decomposition of the body.